UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 3:12-CR-00058-LRH-WGC |
| v. | |
| F. HARVEY WHITTEMORE, | ORDER |
| Defendant. | |

Before the court is defendant F. Harvey Whittemore's Motion in Limine Regarding (1) the Admissibility of Evidence of Whittemore's Reasonable Interpretation of 2 U.S.C. § 441f; and (2) the Admissibility of Testimony of Whittemore's Expert Witness (#79[1]). The government has responded (#111), and Whittemore has replied (#130).

**I.   Facts and Background**

In 2007, defendant Whittemore allegedly promised to raise $150,000 in campaign contributions for a candidate's re-election campaign for the United States Senate. To make good on his promise, Whittemore allegedly used employees of his real estate development company, various family members, and their spouses as conduit donors to the candidate's campaign in order to bypass the individual campaign contribution limits under federal law. Whittemore then allegedly transferred the combined contributions to the candidate's campaign committee.

---

[1] Refers to the court's docket number.

In keeping with federal law, the campaign committee filed a required contribution report with the Federal Election Commission ("FEC") on April 15, 2007. This report allegedly contained false information identifying Whittemore's employees and family members, rather than Whittemore himself, as the source of the campaign funds.

On June 6, 2012, the Grand Jury returned a four (4) count indictment against defendant Whittemore charging him with: (1) making excessive campaign contributions in violation of 2 U.S.C. § 441a(a)(1) ("Count 1"); (2) making contributions in the name of another in violation of 2 U.S.C. § 441f ("Count 2"); (3) false statement to a federal agency in violation of 18 U.S.C. § 1001(a)(2) ("Count 3"); and (4) false statement to a federal agency in violation of 18 U.S.C. § 1001(a)(2) ("Count 4"). (Indictment #1.)

**II.  Discussion**

Whittemore seeks to admit evidence regarding his reasonable interpretation of 2 U.S.C. § 441f,[2] the statute undergirding Count 2. This evidence includes the testimony of linguistics professor Valerie Fridland as well as a post-2007 judicial opinion interpreting § 441f. This evidence purports to show that § 441f is reasonably interpreted to allow conduit contributions like the ones charged against Whittemore. The court finds that admission of this evidence is inappropriate under the Federal Rules of Evidence.

**A.  Legal Standard**

A motion in limine is used to preclude prejudicial or objectionable evidence before it is presented to the jury. Stephanie Hoit Lee & David N. Finley, *Federal Motions in Limine* § 1:1 (2012). The decision on a motion in limine is consigned to the district court's discretion—including the decision of whether to rule before trial at all. *See Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) (noting that a court may wait to resolve the

---

[2] "No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

evidentiary issues at trial, where the evidence can be viewed in its "proper context"). Motions in limine should not be used to resolve factual disputes or to weigh evidence, and evidence should not be excluded prior to trial unless "the evidence [is] inadmissible on all potential grounds." *See, e.g., Indiana Insurance Co. v. General Electric Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). Even then, rulings on these motions are not binding on the trial judge, and they may be changed in response to developments at trial. *See Luce v. United States*, 469 U.S. 38, 41 (1984).

### B. The *Mens Rea* Required for a Criminal Violation of § 441f

Before reaching the evidentiary issue, it is necessary to determine whether a reasonable but mistaken interpretation of § 441f is a complete defense to Count 2. This, in turn, requires the court to resolve the Count 2's intent element.

The court finds that the "willfulness" requirement for violations of § 441f means general knowledge of unlawful conduct. *See United States v. Bryan*, 524 U.S. 184, 196 (1998). The only court to have devoted an extensive analysis to this issue resolved § 441f's *mens rea* requirement in this way. *See United States v. Danielczyk*, 788 F. Supp. 2d 472, 491 (E.D. Va. 2011), *rev'd in part,* 683 F.3d 611 (4th Cir. 2012). Under this requirement, a reasonable but mistaken interpretation of § 441f does not negate the element of intent necessary for a violation of § 441f. Such a misinterpretation is instead one piece of evidence probative of the defendant's general lack of knowledge of his unlawful conduct. It therefore passes the low bar of relevancy under the Rules of Evidence. *See* Fed. R. Evid. 401, advisory committee notes (evidence is relevant if it tends to prove the point for which it is offered and if that point matters to the case).

Title 2 U.S.C. § 437g(d)(1)(A) provides the penalties for violations of § 441f. Under § 437g(d), "[a]ny person who knowingly and willfully commits a violation of [the Federal Election Campaign Act of 1971 ("FECA"), Pub. L. No. 92-225, 86 Stat. 3]" is subject to criminal penalties. Since § 441f is a part of FECA, § 437g(d) provides criminal penalties for a person who "knowingly and willfully" violates § 441f. But what "knowingly and willfully" means in this context is disputed.

In its analysis of §§ 441f and 437g(d), the *Danielczyk* court is persuasive. The court examined the *mens rea* requirement under § 437g(d), concluding that "willfully" in this statute means that the "[g]overnment must prove that [the defendant] intended to violate the law (whatever the law was); but it need not prove [the defendant's] awareness of the specific law's commands." 788 F. Supp. 2d at 491.

The *Danielczyk* court surveyed three possibilities for the interpretation of "willfully" in § 437g. The first possibility was that "willful" "means no more than that the person charged with the duty knows what he is doing." *American Surety Co. of New York v. Sullivan*, 7 F.2d 605, 606 (2d Cir. 1925) (Hand, J.) That is, this use denotes "simple intentionality." *Danielczyk*, 788 F. Supp. 2d at 488. The *Danielczyk* court concluded (citing an opinion by then-Judge Sotomayor) that this interpretation was appropriate where "knowledge of general unlawfulness is unnecessary," as when "the behavior proscribed is wrong in and of itself, because in such instances, the defendant is on notice that, in intentionally engaging in that behavior, he or she probably broke the law." *Id*. at 489 (citing *United States v. George*, 386 F.3d 383, 395 (2d Cir. 2004) (Sotomayor, J.)).

A second interpretation of "willful" involves "the highest level of intent." *Id*. at 487. This understanding of willfulness "requires the defendant to have known that he was violating a specific law." *Id*. Acknowledging that this is a departure from the traditional rule that ignorance of the law is no excuse, the Supreme Court held that this intent requirement should appear where "highly technical statutes . . . present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan v. United States*, 524 U.S. 184, 194 (1998). Such statutes include the tax laws, *Cheek v. United States*, 498 U.S. 192 (1991), and deposit "structuring" statutes under the federal deposit reporting requirements, *Ratzlaf v. United States*, 510 U.S. 135 (1994).

A third interpretation splits the difference between *American Surety* and *Cheek*/*Ratzlaf*. In *Bryan*, the Supreme Court considered the interpretation of "willful" as it appears in a licensing statute for the sale of arms. 524 U.S. at 187. The Court concluded that "the willfulness requirement [of this statute] does not carve out an exception to the traditional rule that ignorance of the law is

4

no excuse; knowledge that the conduct is unlawful is all that is required." *Id.* at 196. The Court thus contrasted knowledge of the "specific law or rule that [the defendant] may be violating" with "knowledge that [the defendant's] conduct [is] unlawful." *Id.* at 192-93. The implication, as articulated by the *Danielczyk* court, is that *Bryan* requires the government to prove "that [the defendant] intended to violate the law (whatever the law was); but it need not prove [the defendant's] awareness of the specific law's commands." *Danielczyk*, 788 F. Supp. 2d at 491; *see also Bryan*, 524 U.S. at 201 (Scalia, J., dissenting) ("Everyone agrees that [the statute] requires some knowledge of the law; the only real question is *which* law? The Court's answer is that knowledge of *any* law is enough.").

Indeed, *Bryan* signals a general retreat from the *Cheek/Ratzlaf* interpretation of wilfulness. Though (as the *Bryan* dissent points out) the distinction between the *Cheek/Ratzlaf* standard and the Bryan standard is really one of statutory interpretation,[3] the *Bryan* majority did not principally resort to canons of construction in arriving at its "general knowledge of illegality" reading for "willfully." "[A]fter consulting the traditional canons of statutory construction" and finding that the statute remains ambiguous, a court will normally resort to the rule of lenity. *United States v. Shabani,* 513 U.S. 10, 17 (1994). This rule requires "ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). However, even after the *Bryan* Court found the legislative history "too ambiguous" to provide much guidance, the Court never reached the rule of lenity. *Bryan*, 524 U.S. at 200 (Scalia, J., dissenting). Instead, the Court relied on common law precepts like "ignorance of the law is no excuse" in interpreting the statute. *Id.* at 194-96. The implication is that *Bryan* sets out a new, generally applicable standard of criminal wilfulness (excepting, perhaps, situations closely analogous to *Cheek* and *Ratzlaf*). *See, e.g.*, Sharon L. Davies, *The Jurisprudence of Willfulness: An*

---

[3] It is, in fact, an example of the ambiguity between *de re* and *de dicto* interpretations, long familiar from the philosophy of language. *See* W.V.O. Quine, *Quantifiers and Propositional Attitudes*, 53 J. of Phil. 177, 178 (1956).

5

*Evolving Theory of Excusable Ignorance*, 48 Duke L.J. 341, 381-87 (1998) (discussing *Bryan*).

Thus, through its rejection of the rule of lenity, *Bryan* implies that the proper interpretation of "willfully" in criminal statutes derives from sources other than canons of statutory construction. In place of resorting to these canons, *Bryan* substitutes an analysis based on statutory complexity and the potential of "ensnaring" innocent conduct. Accordingly, the *Bryan* Court distinguished *Cheek* and *Ratzlaf* by reference to the "highly technical statutes [involved] that presented the danger of ensnaring individuals engaged in apparently innocent conduct." 524 U.S. at 194.

The *Danielczyk* court examined both FECA's complexity and it's potential to ensnare innocent conduct in determining that *Bryan*'s intermediate "willfulness" standard was the appropriate interpretation of § 437g(d). First, the *Danielczyk* court reasoned that "[c]ampaign contribution laws are not so complex or surprising that the average citizen would likely be trapped by them." 788 F. Supp. 2d at 490. Second, though these laws do not rise to the level of complexity of the tax laws, neither do they prohibit conduct whose "wrongfulness is obvious from the surrounding context." *Id*. at 489 (quoting *United States v. Kelly*, 368 Fed. App'x. 194, 198 (2d Cir. 2010)). Indeed, § 437g(d) (in conjunction with § 441f) risks capturing "seemingly innocent conduct." *Id*. at 491. For example, these statutes may apply to a parent reimbursing her college-age daughter's political fundraiser ticket. *Id*. Or a donor may prefer a conduit contribution because she wishes "to avoid solicitations for future donations or publicity about her ability to make substantial donations." Robert D. Probasco, *Prosecuting Conduit Campaign Contributions-Hard Time for Soft Money*, 42 S. Tex. L. Rev. 841, 876 (2001). *See also Ratzlaf*, 510 U.S. at 145 (listing innocent conduct that could be captured by the anti-structuring law). Therefore, the court concluded, "[b]ecause § 441f could capture seemingly innocent conduct," it calls for *Bryan*'s intermediate-level *mens rea* requirement. *Danielczyk*, 788 F. Supp. 2d at 491.

Whittemore, too, accepts the battle lines as *Bryan* has drawn them, arguing that FECA is so complex and so likely to trap the unwary that § 437g(d) warrants a *Cheek/Ratzlaf* level of intent. In *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994) (which Whittemore cites to support these

6

arguments), the defendant was accused of reimbursing individuals for contributions to political campaigns at the defendant's request. *Curran*, 20 F.3d at 562. The government initiated prosecution under 18 U.S.C. §§ 2(b) and 1001 for causing another person (the campaign treasurer) to make false statements within the jurisdiction of a government agency (the FEC).[4] *Id.* at 566. The court identified three ways in which the FECA reporting statute at issue resembled the currency-structuring statute in *Ratzlaf*: both statutes involved disclosure obligations, both statutes criminalized potentially innocent conduct, and both crimes originated in regulatory statutes. *Id.* at 569. Therefore, the *Curran* court concluded, the *Cheek/Ratzlaf* wilfulness standard was appropriate. *Id.* at 570.

*Curran* is distinguishable along multiple dimensions. First, the *Curran* analysis does not address Whittemore's alleged offense, a straw-donor scheme. In other words, *Curran*'s relevance is to Whittemore's Count 3, not his Count 2. Second, as the *Danielczyk* court noted, *Curran* has been limited by courts in its own circuit and rejected by courts outside of its circuit. *See United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009) (limiting the heightened *mens rea* requirement to conjunctive violations of §§ 2(b) and 1001); *see also United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999) (rejecting *Curran*); *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir. 1997) (same). Given courts' quick retreat from *Curran*'s pre-*Bryan* holding, this court declines Whittemore's invitation to extend *Curran* to § 441f offenses.

Whittemore also cites *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), for the proposition that—even under *Bryan*—"as a matter of law, a person cannot willfully violate a statute when his conduct is congruent with an objectively reasonable interpretation of the statute."[5]

---

[4] This charge is therefore similar to Whittemore's Count 3.

[5] In his Reply (#130), Whittemore argues that, since the government did not directly challenge this assertion in its Response (#111), the government has consented to this statement of the law. (Reply #130, p. 3 (citing Local Criminal Rule 47-9).) However, this statement ultimately touches on the *mens rea* requirement for a § 441f violation, and the government has opposed Whittemore's interpretation of this requirement in other places. (*See, e.g.*, Govt's Response #38.) Therefore, the government has

7

(Whittemore's Mot. to Dismiss #30, pp. 8-9.) *Safeco* involved the interpretation of "willful" as it appears in a civil provision within the Fair Credit Reporting Act. 551 U.S. at 52. There, the Court interpreted "willfully" to cover "reckless disregard of a statutory duty," in specific contradistinction to the meaning of "willfully" in the criminal law. *See id*. at 57 n.9 ("Civil use of the term ["willfully"], however, typically presents neither the textual nor the substantive reasons for pegging the threshold of liability at knowledge of wrongdoing."). Furthermore, it is clear that the Court had specific (rather than general) violations of a statutory duty in mind. *See id*. at 57 ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover . . . knowing violations of a standard."). *Safeco* is therefore doubly distinguishable: it addressed (1) a civil standard that (2) embodies knowledge of specific rather than general illegality. And in particular, *Safeco* does not establish an "objectively reasonable interpretation" defense under *Bryan*.

Thus, under Whittemore's Count 2, the government must prove that Whittemore knew his conduct violated *some* law, but it need not prove which one. (And, importantly, such knowledge may be shown by conduct that is "not consistent with a good-faith belief in the legality of the enterprise." *Bryan*, 524 U.S. at 189, n. 8.) Evidence of Whittemore's objectively reasonable interpretation of § 441f is not a complete defense to liability. It is, however, probative of his general lack of knowledge of his unlawful conduct. Therefore, such evidence is admissible unless excluded by the Federal Rules of Evidence. *See* Fed. R. Evid. 402.

**C.  Admissibility under the Federal Rules of Evidence**

Whittemore's proffered evidence with respect to his reasonable interpretation of § 441f includes a post-2007 judicial opinion and the testimony of a linguistics professor. The government objects to Whittemore's proffered evidence on two persuasive grounds: first, that testimony about statutory interpretation calls for a legal conclusion, and second, that such testimony will be confusing to the jury.

---

not "consented" to Whittemore's interpretation.

First, Whittemore's proffered judicial opinion is inadmissible. "Although a district court may exclude evidence of what the law *is* or *should be* . . . it ordinarily cannot exclude evidence relevant to the jury's determination of what a defendant *thought the law was* . . . because willfulness is an element of the offense." *United States v. Powell*, 955 F.2d 1206, 1214 (9th Cir. 1991) (citations omitted). However, "[l]egal materials upon which the defendant does not claim to have relied . . . can be excluded as irrelevant and unnecessarily confusing because only the defendant's subjective belief is at issue: the court remains the jury's sole source of the law." *Id*.

Here, Whittemore does not claim to have relied on the proffered judicial opinion, and therefore the opinion would be irrelevant and unnecessarily confusing to the jury. The opinion in question, *United States v. O'Donnell*, 2009 WL 9041223 (C.D. Cal. June 8, 2009), interprets § 441f to allow conduit donations like those charged against Whittemore. Not only was the opinion reversed on this precise issue, *see United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010), but Whittemore could not possibly have relied on it since it came down after Whittemore's charged conduct. Since the opinion would therefore be inadmissible even under the heightened *Cheek/Ratzlaf* standard, it is *a fortiori* inadmissible here. *See Powell*, 955 F.2d at 1214 (discussing the admissibility of judicial opinions under *Cheek*).

Second, Whittemore's proffered expert testimony is likely inadmissible on two grounds.[6] First, to the extent Whittemore's proferred expert testifies that Whittemore's mistaken interpretation of § 441f was "reasonable," this testimony is excludable as a legal conclusion. *See United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (noting that since "testimony concerning the reasonableness of [the defendant's] belief . . . calls for a legal conclusion," it is "inappropriate matter for expert testimony"). Second, to the extent Whittemore's expert testifies to "plausible" interpretations of § 441f, this testimony is unlikely to "assist the trier of fact" under Rule 702 of the

---

[6] The court finds that the proffered expert, Valerie Fridland, is a qualified expert on the subject of linguistic interpretation, and that her conclusions are the product of the reliable application of reliable principles and methods. *See* Fed. R. Evid. 702.

9

Federal Rules of Evidence.

Whittemore offers Valerie Fridland, a university linguistics professor, to testify to both "plausible interpretations of 2 U.S.C. § 441f" and "reasonable interpretation[s]" of § 441f. (Whittemore's Mot. in Limine #79, pp. 2:9, 10:10.) Fridland trains her analysis on two aspects of the statute's first phrase "No person shall make a contribution in the name of another person." The first piece of analysis centers on the noun phrase "the name of another person," and the second focuses on the word "contribution."

Fridland observes that "the name of another person" is ambiguous: it may mean a false name, or it may mean the name of a specific person whose name is not the same as the contributor.[7] Under the first reading, the statute only prohibits contributions under "a name that has no real world referent (a constructed proper name)." (Whittemore's Mot. in Limine #79, Ex. 1-2, p. 5.) That is, § 441f only prohibits a person from selecting a made-up name and contributing under that name. Under the second reading, the statute prohibits a person from using the name of another person to make a contribution. Fridland concludes that "the second interpretation is intended to be a probable interpretation." (*Id.*)

Fridland then analyzes the word "contribution." Relying on norms of conversation identified by H. Paul Grice, she notes that the word "contribution" is conventionally (but not necessarily) associated with the contributor's own money. *See generally* H. Paul Grice, *Logic in Conversation*, *in* Speech Acts 41 (P. Cole and J.L. Morgan eds, 1975). For example, while the most natural interpretation of "Tom made a contribution" is that Tom made a contribution of his own money (to something), other interpretations are possible. It might be that Tom contributed Frank's money, or that Tom contributed his time. Since possession is typically associated with ownership, Fridland determines that "the statute's most likely [] interpretation does not cover cases where the ownership of funds is first given to another individual who then, as owner of the funds, makes a

---

[7] This is the *de re/de dicto* ambiguity again. *See supra*, note 3.

10

contribution in their own name." (Whittemore's Mot. in Limine #79, Ex. 1-2, p. 10.)

This testimony is unlikely to assist the trier of fact for five reasons. First, Fridland's testimony as to the ambiguity inherent in the noun phrase "the name of another person" is irrelevant: neither Whittemore nor the government have argued the position that § 441f only prohibits contributions under a made-up name—and, in fact, Fridland acknowledges that this position is far-fetched. Therefore, this aspect of Fridland's testimony is likely to prove confusing to the jury. Second, Fridland's testimony as to the meaning of "contribution" presupposes a complete transfer of money between the original owner and the named contributor. But whether Whittemore's transfers to the alleged conduits were complete is an issue to be decided by the jury. Testimony that presumes this issue in Whittemore's favor is likely to confuse rather than assist the jury, especially where the presumption comes clothed in Fridland's impressive academic credentials. Third, Fridland's proposed testimony has nothing to do with Whittemore's actual beliefs. Whittemore does not allege that he relied on Fridland's expertise in interpreting § 441f, and Fridland does not offer testimony "relating to [Whittemore's] own ability to understand the legal principles involved" in § 441f. *See Scholl*, 166 F.3d at 973. Since "only the defendant's subjective belief is at issue," *Powell*, 955 F.2d at 1214, testimony as to his potential beliefs is likely to be confusing.

Fridman's lack of personal knowledge as to Whittemore's beliefs distinguishes the cases on which Whittemore relies to admit her testimony. *See United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997); *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007). In both *Morales* and *Cohen*, the defendant's expert offered to testify about the defendant's "individual confusion" with respect to the law. *Morales*, 108 F.3d at 1037; *Cohen*, 510 F.3d at 1125. For example, the *Morales* expert testified to the defendant's own weak grasp of accounting principles, and the *Cohen* expert testified to the defendant's narcissistic personality disorder. *Id*. Here, however, Fridland's testimony addresses how a generic American English speaker might interpret § 441f. Whittemore's reliance

11

on *Morales* and *Cohen* is therefore misplaced.[8]

Fourth, Fridland's testimony "results from a process of reasoning familiar in everyday life," and therefore it is unlikely to assist the jury. Fed. R. Evid. 701, advisory committee notes. This conclusion draws its force from the very principles underlying Fridland's analysis. One of the Gricean maxims upon which Fridman relies is the "maxim of quantity," which requires the speaker to "make [her] contribution as informative as is required (for the current purposes of the exchange)" and not to "make [her] contribution more informative than is required." By hypothesis, the norms of communication embodied in this maxim (and in the others Fridman cites) are native to all (or nearly all) speakers of American English. In particular, any juror will have access to these norms—and the results they lead to—even without Fridland's testimony. Therefore, the natural and probable consequence of Fridland's testimony in the mind of a juror, according to the maxim of quantity, is that Fridland's testimony carries special weight—why else would she be telling the juror (in technical detail) something he or she already knows? All of this is a long way of saying that Fridland's impressive credentials, combined with testimony as to possible interpretations already obvious to an average juror, will lead the juror to place undue weight on Fridman's interpretations.

Finally, Fridland's testimony's helpfulness is better evaluated in the "proper context" of trial. *Hawthorne Partners*, 831 F. Supp. at 1400. For example, the court is currently unapprised of Whittemore's own proffered testimony. It is possible (though unlikely) that Whittemore's

---

[8] Perhaps a closer analogue to Fridland's proffered testimony is found in cases like *United States v. Gomez-Norena*, 908 F.2d 497, 502 (9th Cir. 1990). There, the Ninth Circuit upheld the admission of a DEA agent's testimony that, in his opinion, the possession of a large amount of cocaine was consistent with an intent to distribute rather than with possession for personal use. 908 F.2d at 502. This testimony resembles Fridland's in that it offers evidence from which the jury may infer the defendant's state of mind. And as with Fridland's proffered testimony, the *Gomez-Norena* expert's testimony did not address the defendant's actual state of mind. However, the *Gomez-Norena* expert's testimony was likely to assist the jury in a way that Fridland's profferred testimony is not, as discussed above. *See* Fed. R. Evid. 702.

testimony will warrant reconsideration of Fridland's ability to assist the jurors. For that reason, the court denies Whittemore's motion without prejudice.

### III. Conclusion

For the foregoing reasons, Whittemore's proffered evidence is inadmissible.

IT IS THEREFORE ORDERED that Whittemore's Motion in Limine (#79) is DENIED. With respect to Whittemore's profferred expert testimony, the Motion is DENIED without prejudice.

IT IS SO ORDERED.

DATED this 10th day of May, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE