1
2
3
4
5
6

GORDON SILVER
DOMINIC P. GENTILE
Nevada Bar No. 1823
Email: dgentile@gordonsilver.com
VINCENT SAVARESE III
Nevada Bar No. 2467
Email: vsavarese@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Tel: (702) 796-5555
Fax: (702) 369-2666

7
8
9
10

JUSTIN J. BUSTOS
Nevada Bar No. 10320
Email: jbustos@gordonsilver.com
100 W. Liberty Street, Suite 940
Reno, NV 89501
Tel: (775) 343-7500
Fax: (775) 786-0103

11
12

*Attorneys for Defendant,*
*F. HARVEY WHITTEMORE*

13

**UNITED STATES DISTRICT COURT**

14

**DISTRICT OF NEVADA**

15
16
17
18
19
20

UNITED STATES OF AMERICA

                    Plaintiff,

vs.

F. HARVEY WHITTEMORE,

                    Defendant.

CASE NO. 3:12-cr-00058-LRH-WGC

**DEFENDANT F. HARVEY WHITTEMORE'S SENTENCING MEMORANDUM**

21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION...................................................................2

    A.   Procedural History of the Case.............................................2

    B.   Sentencing Procedure and Considerations.................................3

II.  A NON-CUSTODIAL SENTENCE IS REASONABLE UPON APPLICATION
    OF 18 U.S.C. § 3553(a) FACTORS TO BE CONSIDERED IN IMPOSING A
    SENTENCE....................................................................5

    A.   The Nature and Circumstanced of the Offense and the History and Character
       of the Defendant (18 U.S.C. § 3553(a)(1).................................5

        1.   The Offense........................................................5

        2.   The History and Character of Harvey Whittemore.............7

    B.   The Group of Factor Addressed in 18 U.S.C. § 3553(a)(2)...............8

        1.   The Need to Reflect the Seriousness of the Offense, Promote Respect
           For the Law and Provide Just Punishment for the Offense.................8

        2.   The Need to Afford Adequate Deterrence to Criminal Conduct
           And Protect the Public From Future Crimes of the Defendant.............11

        3.   The Need to Provide the Defendant with Needed Educational or
           Vocational Training, Medical Care, or Other Correctional
           Treatment in the Most Effective Manner.....................................13

        4.   The Types of Sentences Available.............................14

        5.   The Kinds of Sentence and Sentencing Range Established for
           The Applicable Category of Offense Committed by the Applicable
           Category of Defendant as Set Forth in the Guidelines.....................15

        6.   The Need to Avoid Unwarranted Sentence Disparities Among
           Defendants With Similar Records Who Have Been Found Guilty
           Of Similar Conduct...................................................17

III. THE EXTRAORDINARY AND EXCEPTIONAL NATURE OF
    MR. WHITTEMORE'S COMMUNITY SERVICE AND CHARITABLE
    WORKS JUSTIFY APPLYING LENIENCY IN HIS SENTENCE.......................26

    A.   Extraordinary and Continuing Acts of Charitable and Community Service
       Warrant a Downward Departure.........................................26

    B.   Mr. Whittemore's Charitable Giving Rises Beyond Extraordinary and
       Exceptional Levels.....................................................29

# TABLE OF CONTENTS [CONT'D.]

**Page**

    C.    Mr. Whittemore's Generosity Extends to his Time and Expertise..................32

IV.    CONCLUSION..............................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Buckley v. Valeo*,
    424 U.S. 1, 25 (1976)..................................................................5

*Citizens United v. Federal Election Commission*,
    558 U.S. 310, 314 (2010)........................................................6, 27

*Edmonds v. Perry*,
    62 Nev. 41, 59, 140 P. 2d 566, 574 (Nev. 1943)...............................2

*Gall v. United States*,
    552 U.S. 38, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007)..................3, 14-15

*Koon v. United States*,
    518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ..................3

*Linton v. United States*,
    630 F. 3d 1211, 1216 (9th Cir. 2011)............................................2

*Nelson v. United States*,
    555 U.S. 350, 352, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009).................15

*Pepper v. United States*,
    562 U.S. ──, ──, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011)............11, 15

*Peugh v. United States*,
    ___ U.S. ___, 133 S.Ct. 2072 (2013)...........................................15

*Rita v. United States*,
    551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).................15

*Spears v. United States*,
    555 U.S. 261, 264, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009).................15

*United States v. Autery*,
    555 F.3d 864, 872 (9th Cir. 2009)..............................................4

*United States v. Automobile Workers*,
    352 U.S. 567, 572 (1957)........................................................5

*United States v. Booker*,
    125 S.Ct. 738 (2005)............................................................3

*United States v. Canova*,
    412 F.3d 331 (2nd Cir. 2005)...................................................32

*United States v. Carty*,
    520 F.3d 984, 993 (9th Cir. 2008)..............................................3

*United States v. Chavez*,
    611 F. 3d 1006, 1010 (9th Cir. 2010).........................................3

1

**TABLE OF AUTHORITIES [CONT'D.]**

2

<u>Cases</u>                                                                                    <u>Page(s)</u>

*United States v. Edwards,*
    595 F. 3d 1004 (9th Cir. 2010)..............................................................................8

*United States v. Johnston,*
    2008 WL 2544779 (E.D. Mich. 2008)..................................................................22

*United States v. Menyweather,*
    447 F. 3d 625, 634 (9th Cir. 2006).......................................................................14

*United States v. O'Donnell,*
    608 F.2d 546 (9th Cir. 2010).......................................................................2, 7, 25

*United States v. Prosperi,*
    686 F.3d 32 (1st Cir. 2012)..................................................................................38

*United States v. Ressam,*
    629 F. 3d 793, 827 (9th Cir. 2010)........................................................................3

*United States v. Serafini,*
    233 F.3d 758 (3rd Cir. 2000).........................................................................29, 33

*United States v. Takai,*
    930 F.2d 1427 (9th Cir. 1991).............................................................................27

*United States v. Tomko,*
    562 F.3d 558, 568 (3d Cir. 2009)...........................................................................3

*United States v. Whitehead,*
    532 F.3d 991, 993 (9th Cir. 2008)..........................................................................4

*United States v. Zavala,*
    443 F.3d 165 (9th Cir. 2006)..................................................................................4

## TABLE OF AUTHORITIES [CONT'D.]

**United States Code**                                                             **Page(s)**

2 U.S.C. § 437(g)................................................................................21

2 U.S.C. § 437g(1)(A)(i)...................................................................20-22

2 U.S.C. § 437g(d)(1)(A)(i) ...............................................................25

2 U.S.C. § 437g(D)(1)(D).....................................................................22

2 U.S.C. § 441a.................................................................................20-21

2 U.S.C. § 441a(1)................................................................................23

2 U.S.C §441a(a)(1)...............................................................5, 17-18, 20

2 U.S.C. § 441a(a)(3)(A)........................................................................6

2 U.S.C. § 441a(a)(3)(B).........................................................................6

2 U.S.C. § 441b.................................................................................20-21

2 U.S.C. § 441f .......................................................................5, 17-25, 27

18 U.S.C. § 2.........................................................................................25

18 U.S.C. § 2(b).....................................................................................21

18 U.S.C. § 371......................................................................................20

18 U.S.C. §1001..................................................................................5, 22

18 U.S.C. § 3553................................................................................4, 39

18 U.S.C. § 3553(a)........................................................................3, 5, 13

18 U.S.C. § 3553(a)(2)(A)....................................................................8, 9

18 U.S.C. § 3553(a)(2)(B)..................................................................11-12

18 U.S.C. § 3553(a)(2)(C).....................................................................11

18 U.S.C. § 3553(a)(2)(D).....................................................................14

18 U.S.C. § 3553(a)(3)...........................................................................14

18 U.S.C. § 3553(a)(4)............................................................................4

18 U.S.C. § 3553(a)(4)(A).....................................................................16

1

## TABLE OF AUTHORITIES [CONT'D.]

2

**United States Code**                                                    **Page(s)**

3

18 U.S.C. § 3553(a)(6)……………………………………………………………..…17

18 U.S.C. § 3553(b)………………………………………………………………..…26

18 U.S.C. § 3561(c)(1)…………………………………………………………14, 26

18 U.S.C. § 3563(a)(2)……………………………………………………………..…14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **CERTIFICATION: This memorandum is timely filed.**

2  COMES NOW the Defendant F. HARVEY WHITTEMORE, by and through his

3  attorneys, DOMINIC P. GENTILE, VINCENT SAVARESE, III, and JUSTIN J. BUSTOS, of

4  the law firm GORDON SILVER and hereby submits this Sentencing Memorandum and exhibits

5  in connection with his sentencing presently scheduled for September 30, 2013 at 1:30 p.m. This

6  Memorandum sets forth Mr. Whittemore's position regarding the appropriate sentence to be

7  imposed.

8  Dated this 23rd day of September, 2013.

9  GORDON SILVER

10

11  /s/ Vincent Savarese, III
   DOMINIC P. GENTILE, ESQ.
   State Bar No. 1823

12  VINCENT SAVARESE, III
   Nevada Bar No. 2467

13  JUSTIN J. BUSTOS
   Nevada Bar No. 10320

14  3960 Howard Hughes Pkwy., 9th Floor
   Las Vegas, Nevada 89169

15  Tel: (702) 796-5555
   Attorney for Defendant

16  F. HARVEY WHITTEMORE

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1 of 39

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

### A.    Procedural History of the Case

F. Harvey Whittemore was found guilty of one (1) count of Making Excessive Contributions (Count 1); one (1) count of Making Contributions in the Name of Another (Count 2) and one (1) count of False Statement to a Federal Agency (Count 3) by a jury verdict returned May 29, 2013.    The jury was deadlocked as to Count 4 and the Court declared a mistrial thereupon.    The Government's Motion to Dismiss Count 4 was granted by the Court.

Mr. Whittemore never contested the facts surrounding the Federal Election Campaign Act charges in the indictment.[1]    His defense rested upon four bases: (1) a constitutional challenge to the FECA statutes; (2) the intervening extinguishment of dominion and control over the funds[2] due to the effect of unconditional *inter vivos* gifts having been made to those contributors who were not Mr. Whittemore's children; (3) the Whittemore children's contributions were from their own wealth and interests in a Limited Partnership; and (4) the absence of specific intent, an essential element of the statutes charged, if Mr. Whittemore was believed by the jury to be incorrect as to bases (2) and (3).    His contentions from beginning to end of the trial were set out in his Statement of the Case as read to the jury by the Court (Doc 134).[3]

---

[1] It should be noted that Mr. Whittemore voluntarily signed a stipulation and waiver that extended the statute of limitations for ninety days, among the purposes of which was to give the government additional time to consider its charging decision before returning an indictment.

[2] To support his theory of defense, Mr. Whittemore relied upon *United States v. O'Donnell*, 608 F. 3d 546 (9th Cir. 2010) *cert. denied* 131 S. Ct. 1837 (2011), as read in conjunction with *Linton v. United States*, 630 F. 3d 1211, 1216 (9th Cir. 2011) and other federal decisions that hold that when dominion and control over gifted property is divested is determined by state law. He also relied upon *Edmonds v. Perry*, 62 Nev. 41, 59, 140 P. 2d 566, 574 (Nev. 1943) to provide that answer under Nevada law. At the close of evidence, the Court did not instruct on this theory of defense. It later held that it was a misinterpretation of *O'Donnell*.

[3] "With respect to the events that form the basis of the charges against him, he denies that he made any of the statements attributed to him by agents of the FBI as the basis for count four.    As to the campaign contributions violations that form the basis of counts 1 through 3, he asserts that with respect to his children and their spouses, the contributions were made with their own money and in their own names.    As to the remaining contributions, he asserts that he made unconditional gifts of money to each of the contributors because of his appreciation for their past efforts on his and his family's behalf, that he and his wife had a history of doing so in the community, that they all knew so at the time the gifts were made, that the gifts were made by him personally and not by Wingfield Nevada Group and although he supported Harry Reid's reelection and told them so, they were not required by him to use those gifts to contribute to Harry Reid's campaign but did so of their own free will.    It was their money when they made the contributions in their own names.    It is his position that his conduct was lawful and, if it wasn't, he did not have the intent the law requires for a violation to have occurred."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1

**B.      Sentencing Procedure and Considerations**

2        In light of the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005),

3   it will be the Court's duty at the time of sentencing to impose a sentence which is "sufficient, but

4   not greater than necessary," 18 U.S.C. § 3553(a), to fulfill the purposes of sentencing listed

5   under Section 3553(a)(2). *Booker*, 125 S.Ct. at 750-52, 764-66. The statute directs sentencing

6   judges to use the concept of "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), as

7   an "overarching principle [that] necessarily informs a sentencing court's consideration of the

8   entire constellation of section 3553(a) factors [.]" *United States v. Chavez*, 611 F. 3d 1006, 1010

9   (9th Cir. 2010).

10       In commenting on the post-*Booker* revolution to Federal sentencing procedure at the

11  District Court level, the Supreme Court observed that historically **"[i]t has been uniform and**

12  **constant in the federal judicial tradition for the sentencing judge to consider every**

13  **convicted person as an individual and every case as a unique study in the human failings**

14  **that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."** *Gall*

15  *v. United States*, 552 U.S. 38, 7 (2007), *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035,

16  135 L.Ed.2d 392 (1996)). The sentence can only be reviewed for procedural compliance and

17  reasonableness. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing *Gall*

18  *v. United States*, 552 U.S. 38, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007)). "The touchstone of

19  'reasonableness' is whether the record as a whole reflects rational and meaningful consideration

20  of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Ressam*, 629 F. 3d 793, 827

21  (9th Cir. 2010) (quoting *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009)).

22       If the sentencing court imposes a sentence outside the Guidelines range, the appellate

23  court may not apply a presumption of unreasonableness. *Gall*, 128 S.Ct. at 597. In reviewing

24  any such variance, the appellate court takes into account the totality of the circumstances,

25  including the extent of any variance from the Guidelines range. It may consider the extent of the

26  deviation, but must give due deference to the district court's decision that the § 3553(a) factors,

27

28                              ———————————— (continued)

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1   on a whole, justify the extent of the variance.  The fact that the appellate court might reasonably

2   have concluded that a different sentence was appropriate is insufficient to justify reversal of the

3   district court.  *Id.*  That is because "[t]he sentencing judge is in a superior position to find facts

4   and judge their import under § 3553(a) in the individual case."  *Id.*  Furthermore, when

5   reviewing a sentence that falls outside of the Guidelines range, "appellate courts must 'give due

6   deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent

7   of the variance.'"  *United States v. Autery,* 555 F.3d 864, 872 (9th Cir. 2009) (quoting *Gall,* 128

8   S.Ct. at 597).  The Ninth Circuit has held that "[e]ven if we are certain that we would have

9   imposed a different sentence had we worn the district judge's robe, we can't reverse on that

10  basis."  *United States v. Whitehead,* 532 F.3d 991, 993 (9th Cir. 2008) (citing *Gall,* 128 S.Ct. at

11  597).

12      The mandate to sentence within the specified guidelines has been abolished by *Booker,*

13  but the Guidelines remain a factor which the Court must "consider" before imposing sentence.

14  18 U.S.C. § 3553(a)(4).  As a practical and procedural matter, it makes sense to determine the

15  Guidelines first; although that is not to say they should receive the most weight.  In fact, any

16  special weight to the guideline range relative to the Section 3553(a) factors would violate the

17  Sixth Amendment.  Thus, the Guidelines are but one of the many factors to be considered.

18  *United States v. Zavala,* 443 F.3d 1165, 1170-71 (9th Cir. 2006).

19      This Sentencing Memorandum will address the relevant subsections of 18 U.S.C. § 3553

20  and articulate why an overall analysis of the statutory sentencing factors, the need to avoid

21  sentencing disparity, and the lifetime of extraordinary charitable contributions and community

22  service evidencing Mr. Whittemore's character lead to the conclusion that Mr. Whittemore

23  qualifies for a non-custodial sentence accompanied by a fine and community service.

24  ///

25  ///

26  ///

27  ///

28  **II.     A NON-CUSTODIAL SENTENCE IS REASONABLE UPON APPLICATION OF**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

4 of 39

## 18 U.S.C. § 3553(a) FACTORS TO BE CONSIDERED IN IMPOSING A SENTENCE

### A.   The Nature and Circumstances of the Offense and the History and Character of the Defendant (18 U.S.C. § 3553(a)(1)).

#### 1.   The Offense.

The purpose of 2 U.S.C. § 441a(a)(1) is to limit the amount of money that an individual can contribute to a candidate for federal office so as to further the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). This stems from a stated desire "to purge national politics of what [is] conceived to be the pernicious influence of 'big money' campaign contributions." *United States v. Automobile Workers*, 352 U.S. 567, 572 (1957).

The other section of FECA of which Mr. Whittemore stands convicted, 2 U.S.C. § 441f, is a corollary to § 441a(a)(1) and has as its fundamental purpose insuring transparency as to the source of contributions so as to reveal to the public who is supporting, and therefore presumably influencing, a candidate for federal election. While bundling of campaign contributions is not unlawful, each contribution must be made by using the funds of the person who makes it. The conviction for 18 U.S.C. § 1001 is directly related to and follows from the violation of § 441f. If one uses a conduit to exceed the maximum amount of contributions one can make, they have violated § 441f. When the campaign to which the contributions were made files its report with the FEC and reflects the conduit as the contributor, 18 U.S.C. § 1001 is also violated by the contributor who employed the conduit.

Thus, viewed through the rubric of 18 U.S.C. § 3553(a) factors, it has been the government's position in the past that "the greatest harm and the greatest seriousness of [an] offense like this is the abuse of that transparency that the public wants." *See* Transcript of Sentencing Proceedings, *United States v. Timothy F. Mobley*, Case No. 3:12-cr-150-J-99TJC-JBT (March 19, 2013), page 15, lines 4-7.[4]  Nonetheless, the Supreme Court has recognized

---

[4] Attached as Exhibit 1.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

"[t]hat speakers may have influence over or access to elected officials does not mean that those officials are corrupt. And the appearance of influence or access will not cause the electorate to lose faith in this democracy." *Citizens United v. Federal Election Commission,* 558 U.S. 310, 314 (2010).[5]

Mr. Whittemore concedes the seriousness of the offenses of conviction. Notably, there has been no evidence of a *quid pro quo* or other type of corruption or corrupt motive related to the contributions in this case. In the rebuttal aspect of its summation, the government posited that Mr. Whittemore's motive was to obtain greater power and influence over Senator Reid, but there was no evidence of that introduced at trial. What was proven beyond any doubt is that at the time of the contributions (March 2007) there existed a more than thirty-year relationship between Harvey Whittemore and Senator Harry Reid and that the relationship between Annette Whittemore and the Reid family was even longer, as her physician-father delivered the Reid children. Accordingly, the Whittemore-Reid relationship transcended politics and included social activities and family gatherings and vacations. Moreover, according to the testimony of Jake Perry (Senator Reid's campaign finance director) and Trial Exhibit #68,[6] he made this entry in the Friends For Harry Reid campaign computer system because Mr. Whittemore told Senator Reid and him that the money would be raised from his "family and business associates", some of whom had supported Senator Reid in the past independently of Mr. Whittemore. While this is not intended to attempt to exonerate Mr. Whittemore, it provides context and insight into his motive for keeping his promise to Senator Reid and dispels any notion that there was something sinister afoot as between Mr. Whittemore and Senator Reid.

---

[5] The holding in *Citizens United* has spawned reexamination of and vigorous debate about campaign contribution limits. The Supreme Court will hear argument this term on the following issues regarding campaign contribution limits: 1. Whether the biennial limit on contributions to non-candidate committees, 2 U.S.C. § 441a(a)(3)(B), is unconstitutional for lacking a constitutionally cognizable interest as applied to contributions to national-party committees; 2. Whether the biennial limits on contributions to non-candidate committees, 2 U.S.C. § 441a(a)(3)(B), are unconstitutional facially for lacking a constitutionally cognizable interest; 3. Whether the biennial limits on contributions to non-candidate committees are unconstitutionally too low, as applied and facially; 4. Whether the biennial limit on contributions to candidate committees, 2 U.S.C. § 441a(a)(3)(A), is unconstitutional for lacking a constitutionally cognizable interest; and, 5. Whether the biennial limit on contributions to candidate committees, 2 U.S.C. § 441a(a)(3)(A), is unconstitutionally too low. *McCutcheon v. Federal Election Commission,* #12-536.

[6] Attached as Exhibit 2.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1

### 2.    The History and Character of Harvey Whittemore.

2         In March 2007, at the time of making the checks out to his business associates, Mr.

3    Whittemore did not have the benefit of knowledge of the charges in the Indictment[7] in *United*

4    *States v. O'Donnell*, Case No. 2:08-cr-00872-SJO, United States District Court for the Central

5    District of California, nor the jurisprudence that has subsequently developed, including the Ninth

6    Circuit's holding in *United States v. O'Donnell, supra, fn.3.* As did the defendant therein (and

7    the United States District Court Judge who was reversed by the Ninth Circuit) Mr. Whittemore

8    interpreted the applicable law in a manner that is now determined by the verdict to have been in

9    disregard of the statute.[8]    Notwithstanding that Mr. Whittemore maintained his political

10   fundraising activities well beyond 2007, his behavior described in this Indictment, which

11   encompassed a period of two days, is an isolated instance of him being involved in any illegal

12   activity. The charged behavior ended almost five years before the government investigation of it

13   began. It was an aberration in the context of Mr. Whittemore's life.

14         Mr. Whittemore has lived an honest and law abiding life that has been productive in a

15   very positive way for his family and his community.[9]    He has no prior record of arrest or

16   prosecution. Apart from the poor judgment that he demonstrated in connection with the charges

17   for which he faces sentencing, he has an otherwise positive and unblemished life as a husband, a

18   father, a grandfather, a business owner, a lawyer, a lobbyist, a neighbor, and a community

19   activist/supporter/volunteer. Mr. Whittemore was raised in Reno, Yerington and Sparks, Nevada,

20   in a close-knit family that placed a high regard and value upon education, political awareness and

21   debate, community service and keeping one's word. He and his wife Annette recently celebrated

22   forty years of marriage.

23         Additionally, Harvey Whittemore and Annette Whittemore have been supportive of their

24

25   [7] Attached as Exhibit 3. As will be addressed later herein, Mr. O'Donnell's charges were reduced to a misdemeanor after the Ninth Circuit reversed and remanded the case. *See* footnote 25, *infra.*

26   [8] A copy of the District Court's Order in *O'Donnell* is attached hereto as Exhibit 4.

27   [9] A video production of statements made by some of the friends and family of Mr. Whittemore is being presented to the Court as Exhibit 5 to this Sentencing Memorandum, along with letters from those who know him describing their experiences with his character over the six decades of his life in Sparks, Yerington, Reno and other parts of

28   Nevada.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7 of 39

1    community and its institutions in exemplary fashion.  This will be covered in detail in the final

2    section of this Memorandum.  When considered in contradistinction to the conduct that causes

3    Mr. Whittemore to be before this Court for sentencing, his charitable and community

4    involvement should demonstrate that he is worthy of leniency, as the community is better with

5    him in it than removed from it.

6    **B.**      **The Group of Factors Addressed in 18 U.S.C. § 3553(a)(2)**

7            *1.*      *The Need to Reflect the Seriousness of the Offense, Promote Respect for*
            *the Law and Provide Just Punishment for the Offense.*
8

9            These factors focus on both the specific and general purposes of sentencing and have

10   been applied by district courts in a comparative analytical manner, balancing the defendant's

11   entire life with the specific acts for which he stands convicted.  In *United States v. Edwards,* 595

12   F. 3d 1004 (9th Cir. 2010), the Ninth Circuit affirmed the sentence of probation imposed by the

13   district court for the third consecutive time upon the series of appeals filed by the government.

14   Edwards had previously been convicted of a felony for defrauding Arizona banks of over

15   $3,000,000.00 which he was ordered to pay as restitution.  He failed to disclose that fact on a

16   subsequent loan application and later sought bankruptcy protection.  He again failed to list the

17   obligation as well as other assets and liabilities in the bankruptcy filings and was indicted for

18   bankruptcy fraud.

19           Although the Sentencing Guidelines called for incarceration in the range of 27 to 33

20   months, the district court sentenced him to probation and restitution.  Considering the need for

21   the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to

22   provide just punishment for the offense,"  18 U.S.C. § 3553(a)(2)(A), the district court

23   acknowledged that Edwards's crimes were "extremely serious," but observed that Edwards's

24   "changes in his life prior to any kind of indictment indicate a respect for the law."  *Id.* at 1010.

25   The Ninth Circuit found it to be a reasonable sentence notwithstanding the prior felony

26   conviction and the Guidelines range calculation.

27           In *Autery,* 555 F. 3d 864 (9th Cir. 2009), the Court affirmed a sentence of five-years'

28   probation with conditions in a child pornography case.  The advisory Guidelines range was 41 to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8 of 39

1   51 months. The Court held:

> The government next suggests that the sentence does not, under 18 U.S.C. § 3553(a)(2)(A), adequately "reflect the seriousness of the offense, ... promote respect for the law, [or] provide just punishment for the offense." Reasonable minds can differ as to whether a five-year probation provides "just" punishment, but the district court clearly, and we believe, reasonably, weighed this factor in imposing sentence. First, the sentencing transcript reveals that the district court was desirous of doing what was "just" in this case. Furthermore, in its "Statement of Reasons," the court observed that the statute provides for a term of probation of between one and five years, and stated that it "impose[d] the maximum term of probation because of the seriousness of the offense, to promote respect for the law, [and] to provide just punishment for the offense." Finally, Autery's sentence was not just a term of probation: (i) Autery was required to register as a sex offender, a punishment of lifelong significance (which can cause the listed person to become so socially ostracized that he has difficulty living in many communities); (ii) he is barred from viewing any pornography whatsoever; (iii) he is barred from being within 100 feet of places where minors congregate unless approved by his probation officer; (iv) he is not permitted to travel outside the State of Oregon without prior approval; (v) he is required to participate in mental health evaluation and counseling, including psychotherapy, and to take any prescription drugs as directed; (vi) he is not permitted to possess any firearm; (vii) he is barred from using any computer except for work, or, without approval, any other electronic media—such as a personal digital assistant or cellular phone—with Internet capability; and (viii) he is not permitted to have "direct or indirect" contact with anyone under the age of eighteen, except his own children. Although our colleague may disagree with the district court's decision on this factor, none of the government's arguments persuades us that the way the district court considered the "seriousness of the offense, respect for the law, and just punishment" was an abuse of discretion.

*Id.* at 875-876.

Thus we see that "reasonable minds can differ" as to what 18 U.S.C. § 3553(a)(2)(A) requires in a given set of circumstances. However, if one compares the case at bar to *Edwards* and *Autery*, one is left to conclude that the facts and circumstances of this case certainly do not exclude a non-custodial sentence. Unlike *Edwards*, Mr. Whittemore has never been in trouble with the law prior to this matter. Unlike Mr. Edwards, Mr. Whittemore defrauded no one. Yet, as in *Edwards,* his conduct did end years before he was investigated and indicted. Given that he kept pristine records of the checks that he wrote to the contributors to Senator Reid's campaign, their non-destruction indicates the absence of a "guilty mind" or an effort to avoid detection. But for this episode, for which Mr. Whittemore takes responsibility, Mr. Whittemore does not

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1  otherwise act, think or behave in a criminal manner.

2  As compared to *Autery,* Mr. Whittemore also suffers much even without incarceration.
3  He isn't the only one to perceive it; the community as a whole, his friends and his family find it
4  clearly visible, resulting in general deterrence solely because of the non-custodial consequences
5  of his conviction. For example, following the initiation of this criminal prosecution, and even
6  prior to his conviction, Mr. Whittemore's life has been affected in a profound and permanent
7  manner. Mr. Whittemore is no longer a powerful lobbyist at the forefront of Nevada politics.
8  Instead, Mr. Whittemore has been politically ostracized. This has been a great loss to Mr.
9  Whittemore as he has been heavily involved in politics his entire adult life.

10  Mr. Whittemore is also no longer the head of a billion-dollar company with hundreds of
11  employees. Rather, Mr. Whittemore runs his own small law practice and has one associate.
12  Thus, Mr. Whittemore is no longer the powerful lawyer, lobbyist and businessman that he was at
13  the time of the events in this case. Instead, he maintains a much more modest existence. Mr.
14  Whittemore's reputation as a lawyer and businessman has been permanently damaged. He has
15  been disgraced and humiliated and will have to live with knowing that he may have damaged his
16  family members as well, as the tarnish upon his reputation and widespread negative publicity has
17  had a detrimental effect on the careers of his wife and children. This has put incredible strain on
18  Mr. Whittemore's personal and professional life and has exacerbated his health issues.

19  Moreover, Mr. Whittemore, now as a convicted felon, will be subject to additional severe
20  life-altering penalties. Aside from the damage to Mr. Whittemore's reputation and exclusion
21  from the political community, Mr. Whittemore is subject to serious, if not terminal, damage to
22  his ability to practice law in the State of Nevada. He will no longer be able to vote – a precious
23  and fundamental right of participation in the political system and democratic process that he has
24  exercised his entire adult life and for which he has a passion that was clearly displayed in this
25  case. He will have to register as a convicted felon under Nevada law. A former potential
26  gaming and liquor licensee, he will not likely ever enjoy those privileges. He will not be able to
27  possess a firearm for any reason, sporting or otherwise, including the protection of his family or
28  of himself and his companions in the wilderness while fishing.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

10 of 39

1    With regard to the role that the promotion of respect for the law plays in the Court's
2    sentencing decisions, Mr. Whittemore's unparalleled history of philanthropy and community
3    service, combined with the fact that this crime is a sole aberrant act in an otherwise singularly
4    virtuous life would cause the imprisonment of Mr. Whittemore to promote "not respect, but
5    derision, of the law if the law is viewed as merely a means to dispense harsh punishment without
6    taking into account the real conduct and circumstances in sentencing." *Gall*, 522 U.S. at 54.
7    Section III of this memorandum addresses this issue at length.

8    Accordingly, it is respectfully submitted that these factors can and will be adequately
9    served under the circumstances of this case, in accordance with Ninth Circuit law, with a non-
10   custodial sentence that includes community service and a fine, and such a sentence would be
11   "sufficient, but not greater than necessary." It would provide "just punishment for the offense"
12   as contemplated by this section of the statute.

13                2.      *The Need to Afford Adequate Deterrence to Criminal Conduct and Protect*
14                        *the Public From Future Crimes of the Defendant.*

15   18 U.S.C. § 3553(a)(2)(B) & (C) addresses general and specific deterrence. As for
16   specific deterrence, the likelihood that a defendant will engage in future criminal conduct is a
17   "central factor that sentencing courts must consider." *Pepper v. United States*, --- U.S. ---, 131
18   S. Ct. 1229, 1243 (2011). If a person's historic behavior is any predictor of his future behavior,
19   Mr. Whittemore is not likely to violate the law in the future.

20   Moreover, given the nature of the conviction and the dramatic affect it has had on Mr.
21   Whittemore's professional life, there is no chance that Mr. Whittemore would engage in future
22   criminal conduct relating to campaign contribution violations. First, Mr. Whittemore is losing
23   his right to vote and has been ostracized by the political community. Second, Mr. Whittemore
24   no longer engages in campaign fundraising or bundling. Third, the financial impact on Mr.
25   Whittemore that resulted from the damage to his profession life, dictates that Mr. Whittemore no
26   longer has the financial resources necessary to engage in a conduit contribution scheme. As
27   indicated in the presentence report, Mr. Whittemore has a *negative* net worth in excess of $1.3
28   million. Lastly, given the impact this conviction has had on Mr. Whittemore personally,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

11 of 39

including the knowledge that he may have put his family at risk, there is no chance that Mr. Whittemore would engage in similar conduct. Confinement to prison is simply not necessary for purposes of specific deterrence.

As for both specific and general deterrence, again we look to *United States v. Edwards, supra,* for guidance and enlightenment. There the Ninth Circuit, after studying the legislative history of 18 U.S.C. § 3553(a)(2)(B), upheld the sentence of probation and restitution as reasonable. In so doing, the Court held:

> The Government argues that the district court abused its discretion by finding that it could meet the goal of deterrence as expressed in § 3553(a)(2)(B) with probation and restitution but not incarceration. For support, the Government points to commentary in the legislative history of the Sentencing Reform Act. The portion of the legislative history submitted by the Government indeed expresses the opinion that many cases involving white collar crime were disposed of with probation, "without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S.Rep. No. 98-225, at 91-92 (1983) *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75. Because of the increased importance of general deterrence in white collar crime cases, particularly where, as here, the defendant had previously committed a similar crime, the Government argues that not imposing a sentence of incarceration was reversible error.
>
> We cannot find as a matter of law, however, that the failure to impose a sentence that includes a period of incarceration is a violation of § 3553(a) or inconsistent with the Sentencing Reform Act. We find no support for such a rule. Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration. The district court explicitly considered, weighed and factored into its sentence the important goal of deterrence. We hold that its consideration of the deterrent effect of its sentence was not an abuse of discretion.

*Id.* at 1016-17. The *Edwards* Court went on to note:

> Nor does the legislative history, which is the only source the Government provides in support of its argument, unequivocally support its position. After the statement in the legislative history quoted by the Government, the legislative history continues by stating:
>
>> This is not meant to imply that the Committee considers a sentence of imprisonment to be the only form of sentence that may effectively carry deterrent or punitive weight. *It may very often be that release on*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

12 of 39

> *probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose.*

*Id.* at 1016, n.9. (emphasis added).

On the facts of the case at bar, it is respectfully submitted that whatever impact a custodial sentence would have upon general deterrence is outweighed by the other factors present in this case that dictate that such a sentence, under a totality of the circumstances, would be "greater than necessary" to meet the objectives of 18 U.S.C. § 3553(a). It is highly likely that, *with appropriate conditions attached to it*, the consequences of a felony conviction and fine, and the other disabilities, loss of rights and disqualifications that befall one convicted of making illegal campaign donations where no *quid pro quo* is present will surely be enough to deter those who have the financial wherewithal to commit a violation of FECA laws from so doing. Given the rather small segment of society that has that financial capability and the increased number of both civil and criminal cases that have been prosecuted in recent years, the message is getting out that undesirable consequences attach to such behavior.[10] There is nothing about Mr. Whittemore or the facts of this case that requires his incarceration so as to serve the purpose of general deterrence nor does the need to serve that single sentencing factor make incarceration "necessary" as that term is used in 18 U.S.C. § 3553(a).

> 3.    *The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.*

There is no doubt that Mr. Whittemore has serious health problems, nor should there be any serious debate that the stress of these proceedings has not helped them. That is not, however, a reason that makes incarceration "necessary" for purposes of meeting the goals of 18 U.S.C. § 3553(a).

In *Edwards*, the district court evaluated the need for the sentence imposed to "provide the defendant with needed educational or vocational training, medical care, or other correctional

---

[10] As shall be discussed below, in a post-*Citizens United* environment, an individual and/or a corporation can make unlimited contributions directly to a PAC created to support a candidate. This results in the need for a conduit being unnecessary and impractical in all but the most sinister of circumstances, such as a need to **completely** conceal the presence of a particular contributor. Such circumstance was not present in the case *sub judice*.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

treatment in the most effective manner."   18 U.S.C. § 3553(a)(2)(D).   At the time of resentencing, Edwards was 63 years old and living with diabetes and related medical complications.  Considering his medical condition, the district court reasoned that imprisoning him would simply pass the cost of medical care on to taxpayers.  While the district court agreed with the Government that the Bureau of Prisons was capable of providing for Edwards's medical care, it found that a sentence of probation would satisfy the requirement of providing needed care in the most effective manner.  18 U.S.C. § 3553(a)(2)(D); *Edwards,* 595 F.3d at 1011.

While it is true that Mr. Whittemore is 61 years old with diabetes, peripheral neuropathy, high blood pressure and heart disease, it is respectfully submitted that neither the Presentence Report nor the government can demonstrate that these conditions make incarceration "necessary" to serve this sentencing objective.  Mr. Whittemore receives good medical care from physicians in Northern Nevada.  On the other hand, these conditions would necessitate placement in a facility that has the ability to care for these conditions at taxpayer expense.

### 4.     The Types of Sentences Available.

The language of 18 U.S.C. § 3553(a)(3) "*directs* the judge to consider sentences other than imprisonment." *Gall v. United States,* 552 U.S. 38, 59, 128 S.Ct. 586, 602 (2007) (emphasis added).  Because the Guidelines are not mandatory, the "range of choice dictated by the facts of the case" is significantly broadened.   *Id.*   None of the statutes of conviction mandate incarceration as punishment.  As the Presentence Investigation Report recognizes at page 24, paragraph 111, there is an authorized term of probation of not less than one year nor more than five years, per count, available pursuant to 18 U.S.C. § 3561(c)(1).  A fine, restitution or community service must be imposed as a condition of probation unless extraordinary circumstances exist pursuant to 18 U.S.C. § 3563(a)(2).  The Ninth Circuit has recognized that strict conditions on probation can result in a sentence "as strenuous as any other sentence [a court] could impose." *See United States v. Menyweather,* 447 F. 3d 625, 634 (9th Cir. 2006).

///

///

///

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

14 of 39

> 5. The Kinds of Sentence and Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant As Set Forth in the Guidelines.

In *Peugh v. United States,* --- U.S. ---, 133 S.Ct. 2072 (2013), the Supreme Court recognized that in a post-*Booker* sentencing "a district court is still required to consult the Guidelines. But the Guidelines are no longer binding, and the district court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing. The *Booker* remedy, "while not the system Congress enacted," was designed to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id.* at 2079 (internal citations omitted).

While district courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States,* 552 U.S. 38, 49 (2007), district courts may not "presume" that a within-Guidelines sentence is appropriate. *Id.* at 50; *see also Nelson v. United States,* 555 U.S. 350, 352, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009) (*per curiam*) (the Guidelines range is "not to be *presumed* reasonable"); *Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"). **Rather, district courts must "make an individualized assessment" of the appropriate sentence "based on the facts presented."** *Gall, supra,* at 50, 128 S.Ct. 586. Moreover, a district court may freely depart from the range recommended by the Guidelines based not only on "an individualized determination that [the Guidelines] yield an excessive sentence in a particular case," but also based on "*policy disagreement*" with the Guidelines themselves. *Spears v. United States,* 555 U.S. 261, 264, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (*per curiam*); *see Pepper v. United States,* 562 U.S. ——, ——, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011) ("[O]ur post- *Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views").

///

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

15 of 39

Moreover, 18 U.S.C. § 3553(a)(4)(A) places emphasis that the sentencing court's determination must be focused on the "applicable" category of offense and the "applicable" category of defendant. A detailed list of objections to the Presentence Investigation Report was filed with the author of the Report. As they have been rejected by the Probation Officer in their entirety, Formal Objections will be filed with the Court simultaneously with this Sentencing Memo. This will necessitate a determination by the Court as to precisely what the "applicable" advisory Guideline range is. It is respectfully submitted that the Court may determine the applicable Guideline range in one of two alternative calculations, depending upon how the Court views Mr. Whittemore's argument in his Formal Objections to the Presentence Investigation that § 2B1.1 applies to *malum in se* crimes, such as theft, embezzlement and fraud, and not this *malum prohibitum* crime of donating campaign contributions by proscribed means. In the first instance, if the Court finds that U.S.S.G. § 2B1.1 applies to this offense, the Court might calculate as follows:

    1.  <u>Applicable Category of Offense.</u>

        a.  U.S.S.G.§ 3D1.2(b) requires that all three counts of conviction be grouped on the basis that they involve the same victim and the acts are connected by a common criminal objective.

        b.  Base Offense Level under U.S.S.G. § 2C1.8(a)      **8**

        c.  Specific Offense Characteristic

            The jury's verdict established an unspecified amount in excess of $25,000, which would support application of U.S.S.G. § 2B1.1(b)(1)(C)      **4**

        d.  Adjusted Offense Level      <u>12</u>

        e.  Adjustment for Acceptance of Responsibility      **-2**

        **f.  Total Offense Level**      <u>**10**</u>

In the alternative, if the Court finds that U.S.S.G. § 2B1.1 should not apply to this offense, as argued in the Formal Objections, the Court might calculate as follows:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

16 of 39

2. Applicable Category of Offense.

    a.  U.S.S.G.§ 3D1.2(b) requires that all three counts of conviction be grouped on the basis that they involve the same victim and the acts are connected by a common criminal objective.

    b.  Base Offense Level under U.S.S.G. § 2C1.8(a)       **8**

    d.  Adjusted Offense Level       <u>8</u>

    e.  Adjustment for Acceptance of Responsibility       **-2**

    **f.  Total Offense Level**       <u>**6**</u>

2. Criminal History Category

It is undisputed that Mr. Whittemore has no prior criminal history. Therefore his **Criminal History Category** is '**I**'. As a result, in the absence of any downward departure, the "applicable" advisory Guideline range is, between **6** and **12** months at level **10**. As this is a **Zone B**, he would qualify for probation with a condition or combination of conditions of home detention, intermittent confinement or community confinement. U.S.S.G. § 5B1.1(a)(2) and § 5C1.1(c)(3).

    *6.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct.*

18 U.S.C. § 3553(a)(6) requires district courts to consider the need to avoid *unwarranted* sentencing disparities between similarly situated federal defendants. In this case, it is demonstrable that a non-custodial sentence will not create any unwarranted disparity with respect to other similarly situated defendants. To the contrary, a custodial sentence will result in such an unwarranted disparity when punishment imposed in other similar cases is considered by the Court.

Many cases that fall within the ambit of 2 U.S.C. § 441a(a)(1) and § 441f, including those sufficient to form the basis of a criminal charge, are resolved as civil matters before the Federal Election Commission (hereinafter "FEC"). Additionally, many such cases that are prosecuted by the Department of Justice result in non-custodial sentences accompanied by fines. This is so

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

even in cases involving similar sums of money and where aggravating circumstances in addition to a conduit scheme are alleged by the government. The most recent of these was *United States v. Mobley,* Case No. 3:12cr-00150-MMH-JBT, in which a sentence of probation and a $200,000 fine was imposed by the United States District Court for the Middle District of Florida, Jacksonville Division, on March 19, 2013. Mobley was charged with making $94,500 in illegal campaign contributions to Congressman Vern Buchanan of Florida through the use of conduit contributions.

The Congressman's business partner in an auto dealership was not indicted but was proceeded against civilly for the same conduct on almost identical violations. *See Federal Election Commission v. Sam Kazran a/k/a Sam Khazrawan,* Case No. 3:10-cv-01155, United States District Court for the Middle District of Florida. In that case, the Court found that in the years 2005 through 2007, Mr. Kazran instructed his employees to contribute to the Buchanan Campaign and authorized their reimbursement for such contributions with dealership funds totaling $67,900. He ultimately resolved the case civilly with the agreement to make monthly payments of a fine, although he continued to maintain that his conduct was not "knowing and willful."

An "apples to apples" comparison to the case at bar is that of the FECA violations of James M. Rhodes, *a Las Vegas land developer,* and his companies, Rhodes Design and Development Corporation, Rhodes Ranch General Partnership and Bravo d/b/a Rhodes Framing. Mr. Rhodes was *charged with violating both 2 U.S.C. § 441a(a)(1) and 441f.* Specifically he was accused of *making conduit contributions through his employees* to Clark County Commissioner and Congressional Candidate Dario Herrera[11] and also to *Friends for Harry Reid.* His conduct spanned five years and continued *even after he received a refund in the second year for having exceeded his contribution limit.* In addition, he caused the corporate check ledgers to reflect the reimbursements as "cash for travel," "petty cash" and with merely an asterisk (*) as the legend. Finally, he claimed the contributions as business deductions which was clearly a

---

[11] There was no mention in the conciliation agreement of a *quid pro quo* for the contributions made to Dario Herrera.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

18 of 39

violation of tax law. His matter was resolved with a civil money penalty to the FEC in the amount of $148,000.[12]

Additional examples abound. The following cases were resolved with the payment of civil money penalties to the Federal Election Commission:

- In addition to the penalty paid by Mr. Rhodes, Rhodes Design and Development Corporation executives, James A. Bevan and Nadine Giudicessi, paid a combined $11,000 in civil penalties for their roles in facilitating the conduit contributions, in violation of 2 U.S.C. § 441f. *See* FEC, MUR 5305 (June 2, 2005).[13]

- James Chao and Apex Healthcare entered into a conciliation agreement to pay a money penalty of $275,000 to the FEC in connection with $80,000 in conduit contributions in violation of 2 U.S.C. § 441f. *See* FEC, MUR 5405 (April 27, 2005).[14]

- Multiple individuals and two businesses paid monetary penalties to the FEC of $168,000 for conduit contributions through employees totaling $56,000 in violation of 2 U.S.C. § 441f. *See* FEC, MUR 5357 (December 17, 2003).[15]

- Arlen Cenac, Jr., president and owner of a towing company, made $40,300 in conduit contributions through his employee listed as "remitter" on cashiers' checks in violation of 2 U.S.C. § 441f. It was resolved as a civil money penalty to FEC of $170,000. *See* FEC, MUR 6234 (August 20, 2012).[16]

- A company and its management executives were reimbursed at least $40,000 for conduit contributions that they made in violation of 2 U.S.C. § 441f. The matter was resolved for a civil money penalty to the FEC of $17,000. *See* FEC, MUR 5765 (February 8, 2007).[17]

- Keshi Zhan was a conduit contributor who helped solicit and reimburse approximately $37,500 in campaign contributions in violation of 2 U.S.C. § 441f. That behavior

---

[12] Attached as Exhibit 6.

[13] Attached as Exhibit 7.

[14] Attached as Exhibit 8.

[15] Attached as Exhibit 9.

[16] Attached as Exhibit 10.

[17] Attached as Exhibit 11.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

19 of 39

1      resulted in a $12,500 civil money penalty being paid to the FEC. *See* FEC, MUR 4530

2      (November 15, 2001).[18]

3  Some examples of 2 U.S.C. § 441a(a)(1) and 441f violations that were criminally prosecuted

4  in which the defendants were adjudicated guilty and were sentenced to probation are:

5      ▪ Subsequent to the charges being filed in this case against Mr. Whittemore, Timothy

6      Mobley, a prominent Tampa, Florida real estate developer, was charged with violations

7      of both 2 U.S.C. § 441a(a)(1) and 441f for conduit contributions to Congressman Vern

8      Buchanan of Florida.  The contributions took place over a three year period and totaled

9      $94,500.   Both sides agreed that the appropriate guideline for Specific Offense

10     Characteristics relating to "loss" was U.S.S.G. § 2B1.1(b)(1)(E) as the amount involved

11     was in excess of $70,000 but less than $120,000, but as part of a plea bargain they also

12     agreed to reduce it one level.  The district court sentenced Mr. Mobley to 3 years of

13     probation, with the ability to apply for a reduction and termination of probation after two

14     years, and a fine of $200,000 (which was <u>mandatory</u> pursuant to 2 U.S.C. §

15     437g(d)(1)(D) under the circumstances of the case).[19]

16     ▪ Trucking firm executive John Erickson and his associates funneled more than $250,000

17     in conduit campaign contributions to federal and state candidates in an effort to influence

18     interstate trucking regulations.  More than 20 candidates received the money, including

19     more than $100,000 each to then Wisconsin governor Jim Doyle and U.S. Representative

20     Paul Ryan.   To reimburse himself and others for the contributions, Erickson cashed

21     corporate checks payable to cash, falsified corporate expenses and diverted corporate

22     monies to a cash fund. He pleaded guilty to violations of 2 U.S.C. § 441 a, 441b, 441f

23     and § 437g(d)(1)(A)(ii) and 18 U.S.C. §§ 371 and 2 and was sentenced to 18 months'

24     probation and a $5,000 fine. *See United States v. Erickson,* Case No. 2:07-cr-00238-

---

[18] Attached as Exhibit 12.

[19] The transcript of the sentencing hearing in Mobley is attached as Exhibit 1, *supra.* Attached as Exhibit 13A is the Information and as 13B is the Judgment in a Criminal Case entered in the Mobley matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1  WEC.[20]

2  ▪ David LeBlanc, the founder and chairman of a rehabilitation-hospital company, used

3  corporate funds to make some $50,000 in illegal corporate contributions to a number of

4  federal candidates and committees over a six year period, including Friends for Harry

5  Reid. LeBlanc then authorized reimbursements via irregular bonuses, unscheduled salary

6  increases and undocumented expense payments. *See* FEC Press Release, "Lifecare

7  Companies and Former Employees to Pay $200,000 Penalty for Illegal Contribution

8  Reimbursements" (March 28, 2006).[21] Prior to his guilty plea to violations of 2 U.S.C.

9  441b(a) and 437g(d)(1), LeBlanc paid a $100,000 civil penalty to the FEC. A judge

10 sentenced him to 12 months' probation and a $100,000 fine, with full credit given for his

11 previous payment. *See United States v. LeBlanc,* Case No. 1:06-mj-00091-AK.[22]

12 ▪ Pakistani businessman Abdul Rehman Jinnah, used corporate funds to reimburse friends,

13 employees, business contacts and their family members for campaign contributions made

14 in their names. From June of 2004 to February of 2005, Jinnah engineered more than

15 $50,000 in donations to the committees of U.S. Senators Hillary Clinton and Barbara

16 Boxer, using more than a dozen conduits. Jinnah pleaded guilty to violations of 2 U.S.C.

17 § 437(g), 441b, 441f and 18 U.S.C. § 2(b). The court sentenced him to 3 years probation.

18 *See United States v. Jinnah,* Case No. 2:06-cr-00383-GHK.[23]

19 ▪ Arthur Winn, a Massachusetts developer, used family members and friends as conduits to

20 make campaign contributions to federal, state and local candidates he believed could

21 advance his business interests, including the development of publicly-subsidized projects.

22 To ensure the candidates knew he was responsible for raising the funds, Winn bundled

23 and personally delivered the money. Although the government alleged Winn made more

24 [20] Attached as Exhibit 14A is the information and as 14B is the Judgment in a Criminal Case entered in the Erickson
matter.

25 [21] Attached as Exhibit 15.

26 [22] Attached as Exhibit 16A is the information and as 16B is the Judgment in a Criminal Case entered in the LeBlanc
matter.

27 [23] Attached as Exhibit 17A is the Indictment and as 17B is the Judgment and Probation/Commitment Order entered
28 in the Jinnah matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

21 of 39

than $60,000 in conduit contributions, his guilty plea to two violations of 2 U.S.C. § 441F involved a total of $4,500 in illegal donations. Winn was sentenced to pay a $100,000 fine. *See United States v. Winn*, Case No. 1:11-cr-103500JGD.[24]

- Former assistant secretary of the U.S. Department of Housing and Urban Development and president of a Washington lobbying firm, Jerry Pierce-Santos, pleaded guilty to funneling $17,000 in campaign contributions to a federal candidate through 10 different individuals. His guilty plea to violations of 2 U.S.C. §§ 441f and 437g(D)(1)(D) during calendar year 2003 resulted in a sentence of three years' probation. *See United States v. Jerry Pierce-Santos*, Case No. 1:09-cr-00014-EGS.[25]

- Dennis Johnston, a lawyer, instructed his wife to convert a $10,000 check that he received from another into 5-$2,000 checks in his name, his wife's name, his two sons' names and his law partner's name. He was ultimately sentenced to 2 years' probation and a fine of $10,000. *See United States v. Johnston*, 2008 WL 2544779 (E.D. Mich. 2008).[26]

Similarly, some examples of violations of 2 U.S.C. § 1001 in which the defendants were adjudicated guilty and granted sentences of probation include:

- Fermin Cuza, a Senior Vice President of Mattel, Inc., caused the toy manufacturer to reimburse over $120,000 in contributions made by himself and others to 31 federal campaign committees. Moreover, the payments were made to another company in order to further conceal them. Mr. Cuza ultimately entered a guilty plea to a violation of 18 U.S.C. §1001 and was sentenced to 2 years probation, a fine of $500 and a civil penalty paid to the FEC of $188,000. *See* FEC, MUR 5187 (December 3, 2002) and USDOJ Press Release, "Former Senior Vice President of Mattel, Inc. Sentenced for Causing the

---

[24] Attached as Exhibit 18A is the Information and as 18B is the Judgment in a Criminal Case entered in the Winn matter.

[25] Attached as Exhibit 19A is the Information and as 19B is the Judgment in a Criminal Case entered in the Pierce-Santos matter.

[26] Attached as Exhibit 20A is the Information and as 20B is the Judgment in a Criminal Case entered in the Johnston matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Submission of False Financial Reports to the Federal Election Commission" (July 11, 2005).[27]

- To further the gaming interests of a Native American tribe, South Carolina businessman David Collier facilitated more than $65,000 in conduit campaign contributions for federal candidates and elected officials. The contributions were either advanced or later reimbursed with tribal funds. As a result of his scheme, Collier caused the receiving campaigns to file false statements with the FEC. For his plea to a violation of 18 U.S.C. 1001, Collier was sentenced to five years' probation and a $5,000 fine. *See United States v. Collier,* Case No. 1:07-cr-00182-RCL.[28]

- New York-based wealth manager Evan Snapper, lied about the source of more than $48,000 in conduit contributions to Hillary Clinton's presidential bid. Reports filed with the FEC falsely showed the payments came from 21 individuals, instead of their true donor, his client crime novelist Patricia Cromwell. Mr. Snapper pleaded guilty to a violation of 18 U.S.C. §§ 1001(a)(2) & 2 and was sentenced to 36 months probation and a $3,000 fine. *See United States v. Snapper,* Case No. 1:10-cr-000325-PLF.[29]

In 2 U.S.C. § 441a(a)(1) and 441f violations which were criminally prosecuted and wherein custodial sentences were imposed there is usually the presence of aggravating factors or additional crimes not present in the case *sub judice.*

- Former Oklahoma State Senator Gene Stipe illegally funneled over $245,000 to the Walter Roberts congressional campaign through multiple schemes including $89,689 in conduit contributions through 39 separate straw contributors, a fake sale of a stock trailer, and contributions "disguised as a legitimate art auction." He pleaded guilty to felony perjury, felony conspiracy, and misdemeanor conspiracy, and was sentenced to five years of probation with six months of home detention, a fine of $735,567, and community

---

[27] Attached as Exhibit 21A is the FEC MUR and as 21B is the Press Release related to the Cuza matter.

[28] Attached as Exhibit 22A is the Information and as 22B is the Judgment in a Criminal Case entered in the Collier matter.

[29] Attached as Exhibit 23A is the information and as 23B is the Judgment in a Criminal Case entered in the Snapper matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

23 of 39

service. *See* FEC, MUR 4818 (Jan. 28, 2004) conciliation agreement, Gene Stipe); *see also* Press Release, USDOJ, "Former Oklahoma State Senator Gene Stipe Sentenced for Perjury, Conspiracy, and Federal Elections Violations" (Jan. 30, 2004). At least three other individuals, including former congressional candidate Walter Roberts, Mr. Stipe's secretary Charlene Spears, and former Oklahoma state senator James Lane also entered guilty pleas in connection with the Stipe's scheme; all were sentenced to terms of home confinement or probation "based on their roles in the fraudulent schemes and cover-up that ensued."[30]

■ In a case involving section 441f, Ernest Green wrote a check for $50,000 to the Democratic National Committee and was reimbursed with a shopping bag of $50,000 in $100 bills from a foreign national. FEC civil penalty: $65,000. *See* FEC, MUR 4530 (Dec. 5, 2001) (conciliation agreement, Ernest Green, et al.). Ultimately, Mr. Green pleaded guilty to a failure to file income tax returns and was sentenced to two years of probation, 90 days of home detention and a $10,000.00 fine. *See* Press Release, USDOJ, "Ernest Green Sentenced for Tax Violations" (Apr. 9, 2002). The DOJ reports that multiple other individuals were convicted for a variety of offenses resulting from its investigations; many of these individuals received terms of probation.[31]

■ Pierce O'Donnell, a prominent lawyer, engaged in a conduit contribution scheme, instructing his secretary to approach attorneys and non-lawyer employees to solicit contributions for the Edwards Committee. Approximately $32,000 in conduit contributions by 16 non-attorneys was reimbursed. Due to financial issues, the FEC waived payment of a $272,000 fine. *See* FEC, MUR 5758 (Dec. 7, 2012) (conciliation agreement, Pierce O'Donnell). Mr. O'Donnell entered into a plea agreement in which he pleaded guilty to two misdemeanor counts (rather than a single felony to avoid ending his legal career) of making illegal contributions and serve a six month prison term. However, a federal judge rejected the plea agreement, saying it was too harsh.

---

[30] Attached as Exhibit 24 is the FEC MUR and as 24B is the Press Release related to the Stipe matter.

[31] Attached as Exhibit 25A is the FEC MUR and as 25B is the Press Release related to the Green matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

24 of 39

1   Prosecutors advocated a term of imprisonment, ultimately leading to sixty days in prison,

2   12 months of supervised release, and 500 hours of community service. *See United States*

3   *v. O'Donnell*, 608 F.2d 546 (9th Cir. 2010).[32]

4   ▪ Mitchell Wade was the owner and CEO of MZM, Inc. and engaged in a scheme to use

5   MZM corporate funds to reimburse employees and their spouses for contributions to

6   members of Congress *in exchange for appropriate requests benefiting MZM*, and was

7   fined, along with other respondents, $1,000,000 by the FEC. *See*, FEC, MUR 5666 (Oct.

8   31, 2007) (conciliation agreement, Mitchell Wade, et al.). Mr. Wade pleaded guilty to

9   promote bribery, and election fraud, and was sentenced to 2 ½ years in prison. *See* Wade

10   Judgment in a Criminal Case, Case No. 06-0049; Press Release, FED, "Mitchell Wade

11   and MZM, Inc. Agree to Pay $1,000,000 Civil Penalty for Illegal Contribution

12   Reimbursement Scheme" (Oct. 31, 2007).[33]

13   ▪ Virginia businessman William Danielcyzk coveted an ambassadorship and saw illegal

14   fundraising as a means to achieve it. Mr. Danielczyk funneled nearly $200,000 from his

15   banking firm to Hillary Clinton's political campaigns in 2006 and 2008 using at least 35

16   conduits, many of them his employees. To cover up the scheme, Mr. Danielcyzk went to

17   great lengths to withhold evidence from government investigators. Following a guilty

18   plea to violations of 2 U.S.C. §§ 441f and 437(g)(1)(A)(i) and 18 U.S.C. § 2, he was

19   sentenced to 28 months in prison. *See United States v. Danielczyk*, Case No. 1:11-cr-

20   00085-JCC.[34]   Three of Mr. Danielczyk's employees also pleaded guilty to the

21   conspiracy, among them, 78 year old Eugene Biagi. Biagi was sentenced to two years of

22   supervised release.

23   ///

24

25   [32] Attached as Exhibit 26A is the FEC MUR and as 26B is the Opinion in *United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010).

26   [33] Attached as Exhibit 27A is the FEC MUR, as 27B is the Judgment in a Criminal Case and as 27C is the Press Release for the Wade matter.

27   [34] Attached as Exhibit 28A is the Indictment, as 28B is the Judgment in the Criminal Case entered in the Danielczyk

28   matter. Attached as Exhibit 28C is the Judgment in a Criminal Case entered in the Biagi matter.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

25 of 39

1    ▪   Paul Magliocchetti, the founder and president of a lobbying firm, made hundreds of

2        thousands of dollars in illegal campaign contributions. He was sentenced to twenty-

3        seven months in prison. *See* Press Release, USDOJ, "Lobbyist Sentenced to 27 Months

4        in Prison for Role in Illegal Campaign Contribution Scheme" (January 7, 2011). In

5        connection with the same contribution, his son Mark Magliocchetti admitted to receiving

6        reimbursement payments in connection with his campaign contributions exceeding

7        $120,000. Mark Magliocchetti was sentenced to fourteen days in prison and five and a

8        half months of home confinement.[35]

## III. THE EXTRAORDINARY AND EXCEPTIONAL NATURE OF MR. WHITTEMORE'S COMMUNITY SERVICE AND CHARITABLE WORKS JUSTIFY APPLYING LENIENCY IN HIS SENTENCE

### A. Extraordinary and Continuing Acts of Charitable and Community Service Warrant a Downward Departure.

Whatever the Court may decide concerning the applicable guideline range, the transformative nature of Mr. Whittemore's philanthropic giving and community activism remove this case from the "heartland" of FECA violations and support a downward departure. Furthermore, when considered in the context of his life, they endorse a term of probation.

In the exercise of its discretion while examining the totality of Mr. Whittemore's life as it applies to his criminal offense, this Court should depart downward from a sentence advised by the Guideline calculation because of a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).This admonition harmonizes with the first factor the Court should consider under § 3553(a)(1). "[T]he nature and circumstances of the offense and the history and characteristics of the defendant," in this case, consist of a degree of generosity and humanitarianism not taken into account by the Commission. The Commission "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline

---

[35] Attached as Exhibit 29A is the press Release, as 29B is the Indictment, as 29C is the Judgment in a Criminal Case, and as 29D is the Government's Sentencing Memorandum entered in the Magliocchetti matter .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

26 of 39

1  linguistically applies but where conduct significantly differs from the norm, the court may
2  consider whether a departure is warranted." U.S.S.G. Ch. 1, Pt. A, Sec. 4(b).  "[I]t is difficult to
3  prescribe a single set of Guidelines that encompass the vast range of human conduct potentially
4  relevant to a sentencing decision . . . " Id.; *United States v. Takai,* 930 F.2d 1427 (9th Cir. 1991)
5  As noted earlier in the memorandum, the Supreme Court has reinforced, post *Booker,* the need
6  for the District Court to consider the case of each defendant as "a unique study in the human
7  failings that sometimes mitigate, sometimes magnify, the crime and punishment that ensue."
8  *Gall,* 552 U.S. at 7.

9       It is not necessary to establish that Mr. Whittemore's case falls outside the "heartland" of
10  FECA violations in order for this Court to depart downward from a guideline range sentence
11  based upon his extraordinary and exceptional community service.  However, that his case is
12  highly unusual given the current state of Federal elections law gives the Court reason to lend
13  additional weight to his downward departure argument.

14       Indisputably, U.S.S.G. § 2C1.8, which covers FECA violations, offers sentencing advice
15  to the Court for the crimes of which Mr. Whittemore was convicted.  However, many (perhaps
16  most) violations of the FECA involve fraud, deceit, *quid pro quo* deal-making and other *malum*
17  *in se* behavior.  Mr. Whittemore's offense involved raising money by an impermissible method.
18  But perhaps the most persuasive argument that violations of section 441f are outside the
19  Guidelines' heartland comes from the Department of Justice itself.

20       In recent testimony to the Senate Subcommittee on Crime and Terrorism, Acting
21  Assistant Attorney General Mythili Raman read a statement concerning "Current Issues in
22  Campaign Finance Law Enforcement."[36]  Ms. Raman described the purpose of Federal election
23  enforcement as stemming from the "importance of transparency and fairness in campaign
24  finance, to avoid any individual or entity exercising undue influence over our elections and
25  elected officials."  Ms. Raman went on to note that, as a result of *Citizens United v. FEC,* 558
26  U.S. 310 (2010)*,* an individual may give an "unlimited" contribution to a Super PAC organized

27
28

---

[36] Raman M., Testimony before the Senate Subcommittee on Crime and Terrorism; *Current Issues in Campaign Finance Law Enforcement*; Apr. 19, 2013.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

27 of 39

1    under 501(c) of the Internal Revenue Code, even if that organization's primary purpose is the

2    election (or defeat) of a particular candidate for federal office.  Witness the historic spending by

3    casino magnate Sheldon Adelson and his wife during the 2012 election cycle, an estimated

4    $98,000,000 on at least 34 different candidates and groups.[37]  Furthermore, such organizations

5    **need only disclose their donors to the IRS when they file their tax returns in April of the**

6    **following year**.  Thus, the public now has no way of knowing a Super PAC's donor base or the

7    amount of their donations until over five months after the General election occurred.

8        Applying this policy rationale to Mr. Whittemore's case, it appears that the Government

9    wishes Mr. Whittemore to be the last man killed by the last bullet in the last prosecution of an

10   obsolete law.  Mr. Whittemore was not convicted (or accused) of laundering corporate funds into

11   campaign contributions, or receiving (or even soliciting) any improper benefit in exchange for a

12   donation, coercing or intimidating any person into donating money, or any other unlawful

13   campaign finance act other than using a proscribed method (a conduit contribution) to give more

14   money than the law permitted him, as an individual, to donate directly.  But since 2010, under

15   *Citizens United*, any person wishing to donate a large amount of money to support a candidate

16   while concealing the nature of that donation until after the election can simply open his or her

17   checkbook and donate any quantity within their means to the Super PAC in support of that

18   Candidate.  If Mr. Whittemore did not have a significant negative net worth, he could, tomorrow,

19   write a check for $133,400 to a Pro Reid Super PAC without running afoul of any law.  Put

20   another way, now that a lawful method to give unlimited donations exists, nobody will ever use

21   the proscribed method (conduit contributions) again.

22       There was absolutely no evidence adduced at trial that Mr. Whittemore had any objective

23   other than keeping a fundraising promise to Senator Reid.  Indeed, even the Government argued

24   in their closing remarks that Mr. Whittemore was attempting to "keep a promise" to Senator Reid

25   to raise $150,000.  Mr. Whittemore's defense agreed with the government on that point.  That

26   same promise, made after *Citizen's United*, could be fulfilled by writing a check for $150,000 to

27

28   _____
     [37] *See* Meyer T., *How Much Did Sheldon Adelson Really Spend on Campaign 2012?*, ProPublica (Dec. 20, 2012).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

28 of 39

1   a Super PAC dedicated to Senator Reid's re-election. At the time of the events in the Indictment,

2   it could not. As a lawyer, Mr. Whittemore was aware at the time that if he was incorrect as to his

3   interpretation of the law – if the effect of making an *inter vivos* gift was inconsequential - there

4   would be consequences. The Court has found that it was inconsequential. He has been found by

5   a jury to have disregarded the law. He accepts responsibility for his acts and is remorseful for his

6   transgression of the law.

7   This change of events gives rise to the question "What is it about this case that makes a

8   custodial sentence 'sufficient, but not greater than necessary'?"   In so far as no nefarious

9   objective, *quid pro quo* dealing or other misconduct was committed by Mr. Whittemore, his case

10  falls well outside the "heartland" of violations of the Federal Election Campaign Act.  Moreover,

11  to imprison him based upon a guideline recommendation that would apply with equal force to a

12  person seeking to corrupt a politician, launder money or purchase political favors would promote

13  "not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh

14  punishment without taking into account the real conduct and circumstances in sentencing." *Gall*

15  at 7, (internal quotations omitted).

16  **B.    Mr. Whittemore's Charitable Giving Rises Beyond Extraordinary and Exceptional Levels.**

17

18  Many people give to their communities.  Indeed, an argument can be made that the

19  benefits of advanced, democratic citizenship mandate a degree of charitable giving and extra-

20  vocational regard for one's fellow man. Both the Courts and the Sentencing Guidelines take this

21  into account, noting that "[c]ivic, charitable or public service . . . and prior good works are not

22  *ordinarily* relevant in determining whether a departure is warranted." U.S.S.G.  §  5H1.1

23  However, such civic virtue is relevant for the purposes of a downward departure when the

24  Defendant has engaged in "extraordinary or exceptional civic or charitable conduct."  *United*

25  *States v. Serafini*, 233 F.3d 758, 773-775 (3rd Cir. 2000).  Of course, the determination of

26  whether a defendant's civic contributions are "'laudable' versus 'extraordinary' is a subjective one

27  that involves comparing a defendant's conduct to the norm." *Id.* at 773.

28  ///

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

29 of 39

1   Sentencing memoranda, and a lawyer's duty to advocate zealously for his client, no doubt
2   produce all manner of hyperbole with respect to the character of a criminal defendant facing
3   sentencing. But Mr. Whittemore stands alone in both the quantity of his giving and the varying
4   additional means through which he effectuates good.   To prove as much, Mr. Whittemore
5   presents hard numbers, prepared at great effort, to demonstrate to this Court that he is a paragon
6   of the Reno-Sparks community and a champion of its charitable institutions.

7   The Government has made much of the fact that Mr. Whittemore was a wealthy man.
8   Indeed, he has been a prominent business man for much of his career, before the economic
9   downturn and litigation with his former partners reduced his myriad business interests to tatters.
10   The Government will no doubt point out that large financial gifts made possible only by Mr.
11   Whittemore's former wealth should not be the basis for a downward departure, as they
12   impermissibly reflect upon his socioeconomic status. U.S.S.G. § 5H1.10.   But where a
13   Defendant's benevolence is not a necessary consequence of socioeconomic status, it may be
14   considered.   *Takai* at 774.   Here, even in the context of his wealth and prominence, Mr.
15   Whittemore has given extraordinarily of his money.   Consider the table below, which recounts
16   Mr. Whittemore's salaries and wages for the past 21 years and compares that income to his
17   charitable contributions for the same period.[38]

| Year | Charitable Contributions | Salaries& Wages | Contributions as a Percentage of Salaries and Wages | |
|------|--------------------------|-----------------|-----------------------------------------------------|--|
| 1992 | 33,090.00 | 277.526.00 | 11.92% | |
| 1993 | 29,833.00 | 346,892.00 | 8.60% | |
| 1994 | 34,252.00 | 292,164.00 | 11.72% | |
| 1995 | 37,552.00 | 307,474.00 | 12.21% | |
| 1996 | 203,571.00 | 344,318.00 | 59.12% | |
| 1997 | 103,068.00 | 419,813.00 | 24.55% | |
| 1998 | 116,589.32 | 369,274.00 | 31.57% | |

[38] See Exhibit 30, Declaration of J. Russ Bradshaw, regarding the formulation and accuracy of these figures.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

| Year | Charitable | Wages | Percentage | |
|------|------------|-------|------------|---|
| 1999 | 72,263.00 | 459,063.00 | 15.74% | |
| 2000 | 164,761.74 | 687,277.00 | 23.97% | |
| 2001 | 176,018.52 | 803,797.00 | 21.90% | |
| 2002 | 215,416.82 | 823,281.00 | 26.17% | |
| 2003 | 2,585,083.28 | 548,617.00 | 471.20% | |
| 2004 | 804,322.00 | 296,821.00 | 270.98% | |
| 2005 | 4,403,710.30 | 1,717,304.00 | 256.43% | |
| 2006 | 252,935.62 | 964,658.00 | 26.22% | |
| 2007 | 1,448,012.47 | 523,450.00 | 276.63% | |
| 2008 | 955,325.00 | 518,247.00 | 184.34% | |
| 2009 | 204,986.00 | 454,081.00 | 45.14% | |
| 2010 | 225,092.00 | 439,589.00 | 51.21% | |
| 2011 | 28,090.00 | 207,784.00 | 13.52% | |
| 2012 | 29,835.99 | 267,107.00 | 11.17% | |
| **TOTAL** | 12,123,808.06 | 11,068,537.00 | 110% | |

Judeo Christian religions and popular conceptions of charitable giving admonish a person to give 10% of his or her income as a tithe. In the foregoing table, the Court can clearly see that Mr. Whittemore made roughly $11,068,537.00 in wages and salaries since 1992. In that same period, he has given $12,123,808.06 in charitable contributions, not including smaller gifts and transactions that were not declared for tax purposes. Thus, even by a conservative measure, Mr. Whittemore has given 110% of his wages to charity over the last 21 years, an incredible figure only made possible from capital gains realized by Mr. Whittemore's businesses. He did not give this money in anticipation that he would ever face criminal sentencing. He gave because he was taught to give until it hurts. He did not give paltry sums; he gave extraordinary amounts, considered either as monetary figures or as percentages of income. He gave, on average, $1580.47 per day for 21 years. By any measure, this qualifies as extraordinary and exceptional

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

31 of 39

charitable giving.

Further, there can be no question that Mr. Whittemore's giving was not merely to "pet" causes; he donated to any worthy cause of which he became aware. A longer list of organizations to which Mr. Whittemore donated both money and time is attached as Exhibit C, but this excerpt of twenty demonstrates the breadth of his giving:

**REPRESENTATIVE EXAMPLES OF MR. WHITTEMORE'S CHARITABLE GIVING**

| | |
|---|---|
| The University of Nevada | American Cancer Society |
| Western Nevada College | Kerak Shriner's Fund |
| Boys & Girls Clubs of Truckee Meadows and Mason Valley | Committee to Aid Abused Women |
| Juvenile Diabetes Research Foundation | Evelyn Mount Community Outreach |
| The Whittemore-Peterson Institute | Food Bank of Northern Nevada |
| American Lung Association | City of Refuge |
| American Heart Association | Ronald McDonald House |
| Keep Memory Alive | The Davidson Academy |
| Sparks High School | Veterans of Foreign Wars |
| St. Catherine of Siena Episcopal Church | The Conservation Fund |

That a man could give more than his adjusted gross income may cause a cynic to protest the figures as a bi-product of other sources of wealth for Mr. Whittemore. However, as the Court is aware, Mr. Whittemore's former real estate development empire has entirely collapsed. Even prior to being charged in this Indictment he was forced to resume the practice of law for income and has a substantially negative net worth, all of which is reflected in the Presentence Report. And yet, despite having a heavily negative adjusted gross income for the past four consecutive years while his personal finances collapsed, Mr. Whittemore still gave nearly $500,000 to charity over that period.[39] Such giving is hard evidence of a man who cares nothing for his own wealth; whose charity is an "instinctive part of his character" and worthy of a downward departure. *United States v. Canova*, 412 F.3d 331 (2nd Cir. 2005).

**C.    Mr. Whittemore's Generosity Extends to his Time and Expertise.**

Of course, generosity of time, of one's self, compounds the persuasiveness of an argument for a downward departure. Courts have recognized that charitable deeds, combined

---

[39] Mr. Whittemore's Adjusted Gross Income for 2009, 2010, 2011 and 2012 combined was negative $5,427,478.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1   with charitable gifts, make a persuasive case that a Defendant's civic virtue is sufficiently
2   "extraordinary and exceptional" to warrant a downward departure. For instance, in *United States*
3   *v. Serafini,* the Third Circuit upheld the district court's consideration of "Serafini's generosity
4   with his time as well as his money. Several constituents and friends described situations in which
5   Serafini extended himself to them in unique and meaningful ways during times of serious need."
6   *United States v. Serafini*, 233 F.3d 758 (3rd Cir. 2000). In *Serafini,* the District Court for the
7   Middle District of Pennsylvania sentenced Frank Serafini, a popular State Senator convicted of
8   perjury before a grand jury investigating violations of FECA, to a split sentence of five-months
9   imprisonment and five-months home confinement. This sentence, imposed prior to *Booker*, was
10  based upon a three-level downward departure due to Serafini's acts of civic virtue above and
11  beyond his political office. In particular, the Appellate Court cited three letters submitted in
12  conjunction with Serafini's sentencing memorandum depicting acts of generosity on his part.[40]
13  As the Court will see, Mr. Whittemore's largesse far exceeds that of Mr. Serafini.

14          Attached as Exhibit 31 are 35 of the approximately 60 letters that counsel for Mr.
15  Whittemore has been provided by members of the community. Some of the remaining letters are
16  attached as Exhibit 32, while some were excluded entirely as duplicative in deference to the
17  Court's valuable time. While all of the letters will inform the Court as to the depth and breadth
18  of Mr. Whittemore's charity, character and community service, this memorandum will cite only
19  to letters from Exhibit 31. Also included as Exhibit 5 is a video testimonial of statements made
20  by some of Mr. Whittemore's friends and family.

21  •   Greg Ferraro writes that when his first-grade son was hospitalized for weeks over the
22      Christmas holiday with an uncertain diagnosis "Harvey, without advance notice, arrived in
23      the hospital room pulling a wagon of brand new toys and the latest video game system to
24      entertain our son during this difficult period."[41]

---

[40] Those three letters depicted the following charitable acts: Serafini secured a $300,000 guarantee to a physician treating the brain tumor of a brother of a close friend of Serafini; Serafini employed and mentored a college student disabled in an accident, restoring the young man's will to live; Serafini wrote a check for $750 to forestall foreclosure of the home of an impoverished widow. *Serafini* at 773-774.

[41] In that same letter, the Court will note that Mr. Whittemore purchased uniforms for entire Little League teams,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

33 of 39

1   • As Katie Wilson writes, Mr. Whittemore undertook the financial and emotional support of

2   his nieces and nephews after his sister, Lynn, died leaving five young children behind. "It

3   was normal," she writes, "to have my Uncle Harvey come to the house with boxes and

4   boxes of groceries to make sure our refrigerator was full. It was normal to have closet full

5   of new clothes and a backpack full of supplies after he and my Aunt Annette would take us

6   'back to school shopping.' It was normal that every time my mom 'wasn't feeling well,' I

7   was whisked away to spend a fun-filled weekend with my cousins going to Giants games or

8   Lake Tahoe. I even found out that there were Christmases that were fully funded by my

9   Uncle Harvey. Not only did he take it upon himself to make sure that my basics needs were

10   met, he took it upon himself to make sure that I was protected from the less than desirable

11   realities of my childhood." Mr. Whittemore went to these to give his niece a life that could

12   be considered normal by shielding from the poverty and neglect that so tragically

13   accompanies mental illness. Mr. Whittemore did not limit this stewardship to his nieces'

14   childhoods either. "He has helped me financially numerous times," writes Jenny Wilson,

15   Katie's sister, "even buying a home for me and my children to live in while we struggled to

16   make ends meet."

17   And even though the purchase of a home for an impoverished person is a life-changing

18   kindness, Mr. Whittemore did not limit such gifts to family.

19   • Rosa Ibarra a single mother and Mr. Whittemore's house-keeper of nine years, "we were

20   about to lose our home. Harvey helped us get a load that allowed us to keep our home. He

21   did this knowing we might not be able to respond financially. He knew that the only thing

22   he could receive in exchange was gratitude, and even then he never stops helping us."[42]   In

23   reality Mr. Whittemore did not merely help Ms. Ibarra get a loan, he purchased the home

24   for her and her children. It was not important to Mr. Whittemore that Ms. Ibarra knew the

25   full scale of his generosity; he only wanted to help her family.

26   ———————————— (continued)
    paid for high school bands to travel to Washington D.C., anonymously paid the expenses of Church fundraiser, all
27   without request or public acknowledgement.

28   [42] Ms. Ibarra's letter was translated from Spanish by Ms. Rosa Falcon.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

34 of 39

- Mr. Whittemore helped Caleb Cage, a two-tour Iraq war veteran who now serves the State of Nevada as the Director of the Department of Veterans Affairs, get into the United States Military Academy at West Point when Mr. Cage was a teenager and school mate of Scott Whittemore. This aid was given unbeknownst to Mr. Cage, who was surprised in his panel interview to learn that Mr. Whittemore had intervened on his behalf.

- As Ms. Helaine Morres writes, Mr. Whittemore planned, financed and coordinated the construction of a baseball field for Western Nevada College, which has gone on to have one of the most successful junior college baseball teams in the United States.

- Mr. Whittemore has donated his legislative expertise to the cause of lobbying for anti-discrimination legislation for gay and lesbian persons.

- As Ms. McKenzie states in the video submitted along with this memorandum,[43] Mr. Whittemore, without request, financed the college education of her children after the untimely death of their father, Olympic gold-medal swimmer Don Ward McKenzie Jr.

- One of those two young women, Amanda McKenzie, also wrote on behalf of Mr. Whittemore, citing not only his financial support of her college education but that, after her father died, "Harvey provided Red Hawk's reception hall and catering for my father's life celebration at no cost to my family. Because of Harvey, we were able to have a beautiful and worthy life celebration for my father, something for which I will always have immense gratitude."

- Mark Leiske, writes that Mr. Whittemore provided the necessary financial support for the YMCA of the Sierra to remain open. "His financial support was very significant," he writes, "and his time allocation even greater. Simply put, the Y was able to operate for an additional 10 years thanks to his support until the economic challenges simply became insurmountable."

- Chris Aramini writes that Mr. Whittemore has hosted charity tournaments at Mr. Whittemore's former Golf Course, without any of the customary fees, on behalf of the Boys

---

[43] See Exhibit 5.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

& Girls Club. "Whenever the Club needed anything," Mr. Aramini writes, "Harvey always said 'yes.'"

- Mr. Whittemore recovered "40 years of personal belongings" for Dee Taylor and her children after Ms. Taylor lost her home to foreclosure at no expense to the Taylors but with thousands of dollars of out-of-pocket expense to Mr. Whittemore.

- Mr. Whittemore welcomed Whitney Lofrano, a schoolmate of his daughter Andrea, into his home, offering her "a safe place for studying, storytelling and, if need be, a warm bed." "Someone," Ms. Lofrano continued "finally cared about my well-being."

- Mr. Whittemore employed dozens of young persons who would ask him for employment at his various business and other interests for nothing more than the asking.

- Mr. Whittemore refused to accept any money from Michael Lee when Mr. Whittemore's own father was injured by a dangerous condition in Mr. Lee's car lot and required expensive hospital treatment. "Harvey would not accept my financial assistance or use my insurance, saying 'don't even think about it,'" Mr. Lee writes.

- As Vincent Lombardi notes, Mr. Whittemore once purchased the home of a recently widowed woman at a price far above market value in order to ease her financial burdens.

- Connie West describes, at length, the effort and expense expended by Harvey in financing the hospital care of her husband and mother, respectively.

- Ruedy Edgington tells of Harvey's persistent and substantial financial support of diabetes research on behalf of his son, Matt Edgington.

Mr. Whittemore's exceptional civic virtue permeated his professional life as well.

- As Mr. Whittemore's law partner of 30 years Sam Lionel notes, Mr. Whittemore's work ethic helped build the largest law firm in Nevada, his devoted support of disease research and the University of Nevada scholarships caused him to be named Alumnus of the Year in 2001 and ultimately causes Mr. Lionel to conclude that "Harvey Whittemore is a good person who a jury has found guilty of campaign violations. He has been a good citizen - - contributing his time and money to many charitable causes."

///

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

- Tim Dyhr, Vice-President of Nevada Copper writes, "[t]oo often people choose their advisors for skill and not integrity. In Harvey's case, his integrity trumps skill. Considering how skilled he is, that says a lot." Mr. Dyhr goes on to note that Mr. Whittemore's philanthropy in the Yerington area inspired his own, writing "As a result of the influence of Harvey and Annette, I have chosen to be much more active in the community, recently joining the Board of the Boys and Girls Club of Mason Valley, developing an active personal and professional partnership with local schools to emphasize the value of education and the Yerington Lions Club. Harvey is my benchmark for why and how I participate in and contribute to these organizations."

- Even Mr. Whittemore's professional opponents noted how his honest, charitable character impacted his work. Longtime lobbyist Sam McMullen writes that as a lobbyist, there were many instances where Mr. Whittemore's "counsel, guidance and stern sense of right and wrong disabled an errant plan where not only were the ethics wrong, but his own ethics and respect for how things should happen would not allow him to let it happen."

Of course, these letters don't describe even a hundredth-part of Mr. Whittemore's charitable efforts, beyond the donation of money, within Northern Nevada. Mr. Whittemore coached youth baseball, football and basketball, even at times when his own children were not participants in those sports. Mr. Whittemore was a founding member of the Washoe County Honorary Deputy Sheriff's Association. Mr. Whittemore was the youngest Board Member in the History of the YMCA of Sparks, beginning his service at age 17. Mr. Whittemore has spent thousands of hours mentoring young people, to whom he had no familial relationship. An exhaustive listing would require dozens of pages, but the pattern is clear.[44] No further recitation should be necessary to demonstrate that Mr. Whittemore's sole hobby is improving the community in which he lives. This indelible aspect of his character is highlighted in almost every letter of support we received, but is described with perspective and breadth in the letters from Richard Williamson, Gary Carano, Brad Mamer, Michael Lee and Chris Aramini. (Exhibit

---

[44] A table summarizing Mr. Whittemore's charitable activities is attached as Exhibit 33.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1  A, generally).

2    The Government repeatedly argued that Mr. Whittemore was "greedy" for power.  Mr.
3  Whittemore was once powerful indeed.  He knew that he was deeply blessed and shared his vast
4  blessings with others.  Mr. Whittemore has continued to give selflessly of his time even while
5  simultaneously defending the charges in this case.  Now, as a convicted felon, he will certainly
6  not be able to give his money as he once did, because the likelihood of him regaining such a
7  financial status is virtually non-existent.  But his nature is such that he will continue to give his
8  time and of himself; that's who he is.  That is Harvey Whittemore at his core.

9    The sentencing guidelines did not (and indeed, could not) consider depth and extent of
10  Mr. Whittemore's philanthropic giving and community activism.  Simply put, men such as Mr.
11  Whittemore almost never appear before courts for sentencing.  Moreover, men who have given
12  far less of themselves than Mr. Whittemore and have committed far greater crimes have been
13  granted greater downward departures than that which he seeks.[45]  This Court, in reflecting on Mr.
14  Whittemore's peerless and selfless lifetime of service, should decline to deprive the Reno-Sparks
15  community of the man who has given so much to the community. It is better with him in it than
16  out of it.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

---

24  [45] In *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), the First Circuit affirmed a downward departure from a
25  sentencing range of 87 to 108 months to a sentence of probation in a case in which the Defendant's construction
    company knowingly provided deficient concrete to be used in Boston's "Big Dig" project, one of the largest public
26  works project in national history.  The Defendant also concealed the deficiency of the concrete with false
    documentation.  The Court found that "[t]he crimes at issue do not fit the usual white collar crime profile.  There
27  was no intent on defendants' part to enrich themselves personally.  Nor is there evidence that the Defendants
    intended to do harm to the project or to the taxpaying public in any specific sense."

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    **III.    <u>CONCLUSION</u>**

2        For the foregoing reasons, Harvey Whittemore respectfully submits that a sentence of

3    probation with a condition of community service is "sufficient, but not greater than necessary" to

4    comply with the statutory directives of 18 U.S.C. § 3553.

5        Dated this 23rd day of September, 2013.

6                                           Respectfully submitted,

7                                           GORDON SILVER

8

9                                           /s/ Vincent Savarese, III
                                    DOMINIC P. GENTILE, ESQ.

10                                       State Bar No. 1823
                                    VINCENT SAVARESE, III

11                                       Nevada Bar No. 2467
                                    JUSTIN J. BUSTOS

12                                       Nevada Bar No. 10320
                                    3960 Howard Hughes Pkwy., 9th Floor
                                    Las Vegas, Nevada 89169

13                                       Tel:  (702) 796-5555

14                                       Attorney for Defendant
                                    F. HARVEY WHITTEMORE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    **CERTIFICATE OF SERVICE**

2         I certify that I am an employee of GORDON SILVER, and that on this date, I am serving

3    a true and correct copy of **DEFENDANT F. HARVEY WHITTEMORE'S SENTENCING**

4    **MEMORANDUM** on the parties as set forth below:

5         \_\_\_\_\_  Placing an original or true copy thereof in a sealed envelope placed for collection
6              and mailing in the United States Mail, Reno, Nevada, postage prepaid, following
              ordinary business practices

7         \_\_\_\_\_  Certified Mail, Return Receipt Requested

8         \_\_\_\_\_  Via Facsimile (Fax)

9         \_\_\_\_\_  Via Email

10        \_\_\_\_\_  Placing an original or true copy thereof in a sealed envelope and causing the same
11             to be personally Hand Delivered

12        \_\_\_\_\_  Federal Express (or other overnight delivery)

13        \_XX\_  E-service effected by EM/ECF

14   addressed as follows:

15   Daniel, G. Bogden                          Jack Smith
     United States Attorney                     Chief, Public Integrity Section
16   Steven W. Myhre                            Eric G. Olshan
     Assistant United States Attorney           Trial Attorney
17   100 West Liberty Street, Suite 600         Public Integrity Section
     Reno, NV 89101                             United States Department of Justice
18   Steven.Myhre@usdoj.gov                     1400 New York Avenue, NW
                                                Suite 12100
19                                              Washington, DC 20005
                                                eric.olshan@usdoj.gov
20        DATED this 23rd day of September, 2012.

21

22

23                                                _/s/ Cindy S. Grinstead_____
                                                  An Employee of GORDON SILVER
24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3          I certify that I am an employee of GORDON SILVER, and that on this date, I am serving

4   a true and correct copy of **DEFENDANT F. HARVEY WHITTEMORE'S SENTENCING**

    **MEMORANDUM** on the parties as set forth below:

5

6          _____   Placing an original or true copy thereof in a sealed envelope placed for collection
                   and mailing in the United States Mail, Reno, Nevada, postage prepaid, following
                   ordinary business practices

7

8          _____   Certified Mail, Return Receipt Requested

9          _____   Via Facsimile (Fax)

10         _____   Via Email

11         _____   Placing an original or true copy thereof in a sealed envelope and causing the same
                   to be personally Hand Delivered

12         _____   Federal Express (or other overnight delivery)

13          _XX_   E-service effected by EM/ECF

14   addressed as follows:

15   Daniel, G. Bogden                      Jack Smith
     United States Attorney                 Chief, Public Integrity Section
16   Steven W. Myhre                        Eric G. Olshan
     Assistant United States Attorney       Trial Attorney
17   100 West Liberty Street, Suite 600     Public Integrity Section
     Reno, NV  89101                        United States Department of Justice
18   Steven.Myhre@usdoj.gov                 1400 New York Avenue, NW
                                            Suite 12100
19                                          Washington, DC  20005
                                            eric.olshan@usdoj.gov
20
          DATED this 23rd day of September, 2012.
21

22

23                                              /s/ Cindy S. Grinstead_____
                                                An Employee of GORDON SILVER
24

25

26

27

28

## **TABLE OF EXHIBITS**

| **EX. NO.** | **DOCUMENT** |
|---|---|
| 1. | *United States of America v. Timothy F. Mobley,* Case No. 3:12-cr-150-J-99TJC-JBT, Transcript of Sentencing, Hearing, March 19, 2013 |
| 2. | Trial Exhibit #68, an entry made in the Friends for Harry Reid campaign computer system by Senator Reid's campaign finance director Jake Perry. |
| 3. | *United States of America v. Pierce O'Donnell*, Case No. CR-08-00872, SJO Indictment |
| 4. | *United States of America v. Pierce O'Donnell*, Case No. CR-08-00872, SJO Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Indictment [Docket No. 20] |
| 5. | Video |
| 6. | *In the Matter of James M. Rhodes*, Before the Federal Election Commission, MUR 5305, Conciliation Agreement |
| 7. | *In the Matter of James A. Bevan*, Before the Federal Election Commission, MUR 5305, Conciliation Agreement |
| 8. | *In the Matter of Apex Health Care, Inc. and James Chao*, Before the Federal Election Commission, MUR 5405, Conciliation Agreement |
| 9. | *In the Matter of Centrex Construction Group, Inc., et al.,* Before the Federal Election Commission, MUR 5357, |
| 10. | *In the Matter of Arlen B. Cenac, Jr., and Cenac Towing Co., LLC, et al.,* Before the Federal Election Commission, MUR 6234 |
| 11. | *In the Matter of Crop Production Services, etc.,* Before the Federal Election Commission, MUR 5765 |
| 12. | *In the Matter of Keshi Zhan*, Before the Federal Election Commission, MUR 4530 |
| 13A. | *United States of America v. Thomas F. Mobley,* Case No. 3:12-cr-5345-BT, Information |
| 13B. | *United States of America v. Timothy F. Mobley,* Case No. 3:12-cr-150-J-99TJC-JBT, Judgment in a Criminal Case |
| 14A. | *United States of America v. John W. Erickson,* Case No. 07-cr-238, Information |
| 14B. | *United States of America v. John W. Erickson,* Case No. 07-cr-238, Judgment in a Criminal Case |
| 15. | Press Release – *Lifecare Companies and Former Employees to Pay $200,000 Penalty for Illegal Contnribution Reimbursements* |
| 16A. | *United States of America v. David B. LeBlanc*, Case No. 06-091M, Information |

16B.   *United States of America v. David B. LeBlanc*, Case No. 06-091M,  Judgment in a Criminal Case

17A.   *United States of America v. Abdul Rehman Jinnah*, Case No. 06-00383, Indictment

17B.   *United States of America v. Abdul Rehman Jinnah*, Case No. 06-00383 GHK Judgment and Probation/Commitment Order

18A.   *United States of America v. Arthur Winn,* Case No. 11-10350, Information

18B.   *United States of America v. Arthur Winn,* Case No. 11-10350-001-JGD, Judgment in a Criminal Case

19A.   *United States of America v. Jerry Pierce-Santos*, Case No. 1:09-cr-00014-EGS, Information

19B.   *United States of America v. Jerry Pierce-Santos*, Case No. 1:09-cr-00014-EGS, Judgment in a Criminal Case

20A.   *United States of America v. Dennis Johnston*, Case No. 2:04-cr-80372-VAR-DAS Third Superseding Information

20B.   *United States of America v. Dennis Johnston*, Case No. 2:04-cr-80372-VAR-DAS Judgment in a Criminal Case

21A.   *In the Matter of Fermin Cuza*, Before the Federal Election Commission, MUR 5187, Conciliation Agreement

21B.   Department of Justice News Release -- *Former Senior Vice President of Mattel, Inc. Sentenced for Causing The Submission of False Financial Reports to the Federal Election Commission*

22A.   *United States of America v. David Therrell Collier*, Case No. 1:07-cr-00182-RCL, Information

22B.   *United States of America v. David Therrell Collier*, Case No. 1:07-cr-00182-RCL, Judgment in a Criminal Case

23A.   *United States of America v. Evan H. Snapper*, Case No. 1:10-cr-00325-PLF, Information

23B.   *United States of America v. Evan H. Snapper*, Case No. 1:10-cr-00325-PLF, Judgment in a Criminal Case

24A.   *In the Matter of Gene Stipe*, Before the Federal Election Commission, MUR 4818 Conciliation Agreement

24B.   Department of Justice News Release -- *Former Oklahoma State Senator Gene Stipe Sentenced for Perjury, Conspiracy, and Federal Elections Violations*

25A.   *In the Matter of Ernest Green and Phyllis Caudle-Green*, Before the Federal Election Commission, MUR 4530, Conciliation Agreement

| | |
|---|---|
| 25B. | Department of Justice News Release -- *Ernest Green Sentenced for Tax Violations* |
| 26A. | *In the Matter of Pierce O'Donnell*, Before the Federal Election Commission, MUR 5758, Conciliation Agreement |
| 26B. | *United States of America v. Pierce O'Donnell*, 608 F.3d 546 (9th   2010) |
| 27A. | *In the Matter of MZM, Inc., Mitchell J. Wade,* Before the Federal Election Commission, MUR 5666, Conciliation Agreement |
| 27B. | *In the Matter of MZM, Inc., Mitchell J. Wade,* Before the Federal Election Commission, MUR 5666, Judgment in a Criminal Case |
| 27C. | News Release – Mitchell Wade and MZM, Inc. Agree to Pay $1,000,000 Civil Penalty for Illegal Contribution Reimbursement Scheme |
| 28A. | *United States of America v. William P. Danielczyk, Jr.*, Case No. 1:11 CR 85, Information |
| 28B. | *United States of America v. William P. Danielczyk, Jr.*, Case No. 1:11 CR 85-001 Judgment in a Criminal Case |
| 28C. | *United States of America v. Eugene R. Biagi,* Case No. 1:11 CR 85-002. Judgment in a Criminal Case |
| 29A. | Department of Justice News Release – *Lobbyist Sentenced to 27 Months in Prison for Role in Illegal Campaign Contribution Scheme* |
| 29B. | *United States of America v. Paul J. Magliocchetti*, Case No. 1:10CR286, Indictment |
| 29C. | *United States of America v. Paul J. Magliocchetti*, Case No. 1:10CR286, Judgment in a Criminal Case |
| 29D. | *United States of America v. Paul J. Magliocchetti*, Case No. 1:10CR286, Government's Sentencing Memorandum |
| 30. | Declaration of J. Russ Bradshaw |
| 31. | Character Letters Cited in Sentencing Memorandum |
| 32. | Additional Character Letters |
| 33. | Summary of Charitable Activities |